John D. WORTHINGTON, Appellant (Defendant Below),

v.

STATE of Indiana, Appellee (Plaintiff Below).

No. 3-479A100.

Court of Appeals of Indiana, Third District.

Sept. 25, 1980.

Rehearing Denied Dec. 8, 1980.

James A. Greco, Greco, Gouveia, Miller, Pera & Bishop, Merrillville, for appellant.

Theodore L. Sendak, Atty. Gen., Carmen L. Quintana, Deputy Atty. Gen., Indianapolis, for appellee.

HOFFMAN, Judge.

Defendant–appellant John D. Worthington appeals his conviction of neglect of a

child, IC 1971, 35–14–1–4 (Burns Code Ed.)[1] for which he was sentenced to a period of not less than one year nor more than five years. The issues raised by his appeal include:

(1) Is IC 1971, 35–14–1–4 unconstitutional?

(2) Did the trial court err in denying Worthington's motion to dismiss due to prosecutorial vindictiveness?

(3) Did the trial court err in sustaining the State's motion in limine?

(4) Was Worthington's fourth statement to the police involuntary?

(5) Were certain instructions erroneously refused?

(6) Was an instruction tendered by the State erroneously given?

(7) Should certain photographs of the victim have been excluded at trial?

(8) Was it error to admit evidence concerning prior bad acts on the part of Worthington's wife?

(9) Should the court have excluded expert testimony regarding the non–accidental nature of the victim's demise? and

(10) Was the evidence sufficient to sustain the conviction?

Viewing the evidence in a light most favorable to the verdict discloses the following sequence of events: Worthington arrived home from work at 8:00 A.M. on August 11, 1977. Upon entering the house he heard splashing in the bathroom so he proceeded in that direction. What he then observed is best explained by portions of his fourth statement to the police:

"My daughter and wife was [sic] in the bathtub. My wife was straddling over my daughter with her hands over Susan's buttocks. My wife was pushing down on Susan to get her to soak in the water for her bruises. I seen [sic] my daughter's head pop up with her head cocked back and noticed her lips was [sic] purple and her feet was [sic] splashing. water. I walked out of the bathroom, went to the kitchen, got a bottle of pop out of the refrigerator, a glass of ice out of the freezer, went in the living room, set [sic] down, raised my feet up and was watching cartoons. I set [sic] there for a few minutes, my wife came in and set [sic] down and started watching television. She set [sic] there for a few minutes, got up and left the room and a few minutes later I heard water running in the bathroom. Ten or fifteen minutes later, I heard my wife scream, John. By the time I got up, she was coming down the hall carrying my daughter over her shoulder. I noticed water running out of her mouth and I got up and followed her, I assumed something had happened in the bathroom."

The Worthingtons attempted mouth–to–mouth resuscitation and an ambulance was summoned. Despite efforts by paramedics to revive her, Susan was pronounced dead soon after her admission to Porter Memorial Hospital. The cause of death was determined to be suffocation or asphyxiation.

■ Worthington launches an attack on the constitutionality of IC 1971, 35–14–1–4. The first prong of his challenge is that the statute is void for vagueness. A statute will not be found unconstitutionally vague if individuals of ordinary intelligence would comprehend it to adequately inform them of the conduct to be proscribed. *Hunter v. State* (1977), Ind.App., 360 N.E.2d 588.

IC 1971, 35–14–1–4 provides as follows: "Any parent, guardian or person having the care, custody or control of any child who shall abuse, abandon, be cruel to or neglectful of such child, or any person who shall be deemed to be guilty of 'cruelty and neglect of children' shall, upon

---

1. This statute was repealed by Acts 1976, P.L. 148, § 24. For new law see IC 1971, 35–46–1–4 (1980 Burns Supp.).

conviction thereof, be fined not less than two hundred dollars [$200] nor more than one thousand dollars [$1,000] or imprisoned for a term not more than one year, or such person may be imprisoned in the state prison for not less than one [1] year nor more than five [5] years, and may be disenfranchised and rendered incapable of holding any office of profit or trust."

This statute must be read in conjunction with IC 1971, 35–14–1–2 which defines the pertinent offense.

"Neglect of a child shall consist in any of the following acts, by anyone having the custody or control of the child; (a) wilfully failing to provide proper and sufficient food, clothing, maintenance, regular school education as required by law, medical attendance or surgical treatment, and a clean and proper home, or (b) failure to do or permit to be done any act necessary for the child's physical or moral well–being: Provided, however, That no provision of this act [35–14–1–1–13–14–1–7 [sic]] shall be construed to mean that a child is neglected or lacks proper parental care whose parent, guardian or custodian in good faith selects and depends upon spiritual means or prayer for the treatment or cure of disease or remedial care of such child."

■ Considered together these statutes clearly set forth and segregate the type of behavior proscribed by law. Certainly a fact question will be presented as to whether or not any particular conduct is in violation of the statute. Reasonable adults of common intelligence are capable of judging if the defendant's lack of action while he watched his child being dunked in a tub of water until her.lips turned purple involves the "failure to do or permit to be done any act necessary for the child's physical or moral well–being." The statute is not so broad that it would lead to arbitrary and erratic arrests and convictions nor would a reasonable person interpret the statute to

apply to normal punishment of a child. It is not infirm for lack of specificity. *Hunter v. State, supra.*

■ Another constitutional assault mounted by Worthington is that he was denied equal protection of the laws inasmuch as the prosecution had the unbridled discretion to charge either a felony or a misdemeanor on the same set of facts. This onslaught is based on a comparison of the wording of IC 1971, 35–14–1–4 and IC 1971, 35–14–3–1 (Burns Code Ed.).[2]

"Any parent, guardian or person having the care, custody or control of any child who shall abuse, abandon, be cruel to or neglectful of such child, or any person who shall be deemed to be guilty of 'cruelty and neglect of children' shall, upon conviction thereof, be fined not less than two hundred dollars [$200] nor more than one thousand dollars [$1,000] or imprisoned for a term not more than one year, or such person may be imprisoned in the state prison for not less than one [1] year nor more than five [5] years, and may be disenfranchised and rendered incapable of holding any office of profit or trust."

IC 1971, 35–14–1–4.

"Any person who shall cruelly ill–treat, abuse, overwork or inflict unnecessary cruel punishment upon any person under the age of eighteen [18] years, and any person having the care, custody or control of any person under the age of eighteen [18] years who shall wilfully abandon or neglect the same, shall be guilty of a misdemeanor, and upon conviction thereof by any justice of the peace, mayor, police judge or criminal court, shall be fined not less than five dollars [$5.00] nor more than fifty dollars [$50.00] for each offense, to which may be added imprisonment not exceeding thirty [30] days."

IC 1971, 35–14–3–1.

It has been held that a statute which prescribes different punishments or differ-

---

**2.** This statute too was repealed by Acts 1976, P.L. 148, § 24. For new law see IC 1971,

35–46–1–4. Under the new law none of Worthington's constitutional objections would arise.

ent degrees of punishment for the same act committed under the same circumstances by persons in like situations is violative of the equal protection clause of the Fourteenth Amendment. *See, Olsen v. Delmore* (1956) 48 Wash.2d 545, 295 P.2d 324. Consequently, the focus of the inquiry for constitutional purposes is whether the elements of the statutes involved are the same or essentially the same. *Roush v. White* (N.D. Ohio 1975) 389 F.Supp. 396; *People v. Eineder* (1969) 16 Mich.App. 270, 167 N.W.2d 893. If not then no equal protection question is presented.

In the case at bar, it can be seen that the elements of the felony and misdemeanor statutes differ since the latter requires proof of wilfulness. While the fact that the proof necessary to establish commission of the misdemeanor was greater than that required to prove the felony may appear incongruous, it does not eradicate the distinction between the two offenses. *State v. Reid* (1965) 66 Wash.2d 243, 401 P.2d 988. A defendant's constitutional right to equal protection of the laws is not violated by the prosecutor exercising discretion in deciding to prosecute or not to prosecute a violation of a criminal statute. The fact that this discretion extends to two crimes instead of one does not convert this discretion into an unconstitutional delegation of legislative authority or constitute a denial of the equal protection of the laws even though the facts to be proven are very similar. Cf., *People v. McCollough* (1974) 57 Ill.2d 440, 313 N.E.2d 462 where the Illinois Supreme Court reiterated its view that if the conduct for which a defendant is prosecuted constitutes a misdemeanor under one statute and a felony under another there is no equal protection violation in convicting him of the felony.

As a corollary Worthington posits that it is unconstitutional for the felony statute to require less proof yet provide for greater penalties than its misdemeanor counterpart. It is unclear from Worthington's brief exactly what constitutional provision was allegedly impinged. Nowhere has he included a statement of the legal test to be applied in assessing the validity of the statute nor has he cited any relevant authority in support thereof. Upon challenge in court all statutes are presumptively rational and constitutional and the party opposing the statute has the burden of overcoming this presumption and making the constitutional defects clearly apparent. *Bd. Comm'rs v. Kokomo City Plan Comm.* (1975), 263 Ind. 282, 330 N.E.2d 92. Worthington has not met this burden.[3]

Next Worthington maintains that the trial court erred in denying his motion to dismiss due to prosecutorial vindictiveness. The facts giving rise to the filing of this motion were as follows: Dorothy Worthington was charged with Susan's death on August 13, 1977. During the ensuing trial which began November 28, 1977, Worthington was called as a witness by the State but he declined to testify on the grounds that the fourth statement was untrue. Over his objection Worthington was granted use immunity and ordered to testify. Still he refused. As a result he was found in contempt of court. On December 5, 1977 the instant charge was filed against him.

To underpin the claim of prosecutorial vindictiveness the following factors have been stressed: (1) there was not one police report directly aimed at Worthington; (2) the charge against him was not filed until he refused to testify against his wife; (3) the charge could have been brought sooner because all of the evidence against him was collected prior to his wife's arrest; (4) he was not charged earlier because the prose-

---

**3.** It should be observed that the Legislature has a wide latitude in declaring what constitutes a crime and in excluding knowledge or intent from its definition. *See, State v. Chisholm* (1967), 4 Conn.Cir. 565, 237 A.2d 101. The General Assembly may have felt that the conduct denounced in the felony statute was more likely to occur than that condemned in the misdemeanor statute and for that reason a greater penalty was required as a deterrent.

cution wanted him to have a clear record if and when he testified against his wife; (5) the prosecution was aware prior to his wife's trial that he would not testify against her; and (6) the prosecutor considered the possibility that this was a bad case to prosecute and was going to obtain his successor's consent to file the charge.

The State replies that the charge was properly filed because the prosecutor had probable cause to believe that Worthington had committed a crime. It also insists that the primary reasons for not bringing the charge sooner were the expectation that Worthington would testify against his wife and a concern that such a charge would result in undue publicity during her trial.

Having carefully reviewed the entire record it cannot be said that the trial court erred in its overruling of the motion to dismiss. While Detective Allen did admit on cross–examination that there was not one police report aimed directly at Worthington, it was brought out on re–direct that in the course of his investigation he had compiled a single report encompassing both Worthington and his wife. No inference of vindictiveness can be drawn from the fact that the chief investigator into the death of Susan Worthington made a joint report rather than two separate ones.

In response to the next three factors it is well settled that a prosecuting attorney is vested with broad discretion in the performance of his duties, *Sharpe v. State* (1977), Ind.App., 369 N.E.2d 683, including the decision when to prosecute. *State v. Wilbanks* (1973) 95 Idaho 346, 509 P.2d 331. Even if the prosecutor knew all the facts pertinent to the instant case when he indicted Dorothy there is no authority requiring him to indict Worthington at the same time. Moreover, there was nothing impermissible in waiting to file the charge until the prosecution knew whether Worthington would testify against his wife. There was information available to the prosecutor which indicated that the couple had not been getting along and this breach left

open the possibility that Worthington would decide to testify. Additionally, the indictment of Dorothy for murder had generated a great deal of publicity and it was felt that charging Worthington at the same time would only compound the situation. Finally, aside from a bald assertion that the prosecution wanted Worthington to have a clear record in the event he did so testify, no showing has been made that such a tactic was improper.

Likewise the allegation that the prosecution knew beforehand that Worthington would not testify against his wife is unfounded. The only references in the record regarding this matter occurred during cross–examination of Robert Harper, Porter County Prosecutor.

"Q. I mean, did I ever indicate to you that he would testify against his wife?

"A. I don't believe that you ever said that he would testify against his wife.

\* \* \* \* \* \*

"Q. And my client, I advised you, would never agree to testify against his wife?

"A. See, I don't recall that. I recall that you said you couldn't guarantee that he would or you weren't sure that he would. I can't remember you ever saying definitely he wouldn't."

Nothing in these exchanges indicates the degree of awareness suggested by Worthington.

Nor is the contention that Harper thought the case against Worthington was a "bad one" to prosecute reflected in the record. Harper testified that while he did discuss the case with his successor it was in relation to what charges should be filed. Since there was a possibility of charging Worthington with murder or manslaughter Harper sought the advise of the newly–elected prosecutor before filing any charges. There was nothing improper here.

■ Irrespective of the aforementioned factors Worthington has not demonstrated how he was prejudiced by the pre—indictment delay. Prejudice flowing from such a delay may be shown by the loss of a material witness or other missing evidence or fading memory caused by lapse of time. If the prosecution deliberately utilizes delay to strengthen its position by weakening that of the defense or otherwise impairs a defendant's right to a fair trial, an inordinate pre–indictment delay may be found to be prejudicial. *People v. Archerd* (1970) 3 Cal.3d 615, 91 Cal.Rptr. 397, 477 P.2d 421. Here the delay was neither unreasonable nor vexatious and was not deliberately caused to harass Worthington.

None of the cases cited in support of a finding of prosecutorial vindictiveness are controlling. Representative of this line of decisions are *North Carolina v. Pearce* (1969) 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 and *Blackledge v. Perry* (1974) 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628. In *North Carolina v. Pearce*, the Supreme Court examined the issue of whether a trial court can impose a more severe sentence upon retrial and reconviction after an accused has successfully challenged his first conviction on appeal. The court held that, although heavier sentences are not absolutely prohibited, due process requires that the reasons for imposing such sentences upon retrial must affirmatively appear so that an accused may be free when taking an appeal of any apprehension of subsequent retaliatory or vindictive sentencing because of his successful appeal.

In *Blackledge v. Perry* the Supreme Court extended the rule in *Pearce* to protect the accused against the apprehension of prosecutorial vindictiveness. In *Blackledge* the defendant, Perry, was initially charged with a misdemeanor assault with a deadly weapon for an altercation with another inmate that occurred while Perry was in prison. Perry was convicted in an inferior court and given a sentence of six months confinement, said sentence to run upon completion of the prison term he was then serving. Perry chose to exercise his right under state law to a trial *de novo* in a higher court. Prior to the trial *de novo* the prosecution obtained an indictment charging Perry with a felony for the same acts for which he had previously been charged with a misdemeanor. The net result was an increase of eleven months in Perry's sentence. The Supreme Court held that when the circumstances pose a realistic likelihood of vindictiveness due process requires a rule analogous to that of the *Pearce* case. Thus, even though there was absolutely no evidence of vindictiveness in the record the court held that it was constitutionally impermissible for the prosecution to bring the more serious charge against Perry after he had exercised his statutory right to appeal.

*Pearce, Blackledge* and their progeny establish a prophylactic rule imposing limits upon prosecutorial discretion in seeking *new indictments or in conducting retrials* when such actions carry with them the opportunity of retaliation for a defendant's exercise of a statutory right that has due process implications. Neither of these considerations is present in the case at hand.

■ Closely related to the preceding discussion is whether the trial court erred in sustaining a motion in limine prohibiting defense counsel from showing a motive for vindictiveness on the part of the prosecution. The pertinent ruling was as follows:

"At this time the court will sustain the State's Motion in Limine in this regard: That the defendant is permitted to introduce any and all evidence he wishes regarding the trial or proceedings in the trial of Dorothy Worthington, including the fact that he was found in contempt for failure to testify. The defendant is also permitted to show lack of credibility on the part of the State's witnesses but the defendant is not permitted to attempt to show motivation for vindictiveness on the part of the prosecutor's office in the fact that because the events transpired this charge would have been placed against John Worthington. . . ."

Worthington contends that this ruling was in error because it denied him the opportunity during final argument to comment on all the reasonable inferences to be drawn from the evidence at trial. Specifically, he insists that he ought to have been allowed to argue before the jury as to the reasons the prosecution filed the charge when it did. This argument is without merit. Insofar as prosecutorial vindictiveness in filing charges is not a defense to the crime of child neglect, a discussion of the subject before the jury would have been irrelevant, pointless and possibly confusing. *See, Ashbaugh v. State* (1980), Ind., 400 N.E.2d 767.

Worthington also insists that admission of his fourth statement into evidence was error inasmuch as it was involuntary. A statement by an accused is not admissible against him if it is not voluntarily given. In deciding whether a statement was voluntarily given it is necessary to look to all the circumstances surrounding its making to determine whether it was induced by any violence, threats, promises or other improper influence. *Ortiz v. State* (1976), Ind., 356 N.E.2d 1188. When reviewing the trial court's ruling on the voluntariness of a statement, evidence will not be weighed. Rather the inquiry is limited to whether there is sufficient evidence to support the trial court's finding. *Porter v. State* (1979), Ind., 391 N.E.2d 801.

The record reveals that Worthington arrived home at 8:00 A.M. on August 11, having worked the 11–7 night shift at Gary Sheet & Tin. Shortly after the paramedics had rushed Susan and Dorothy to Porter Memorial Hospital, he proceeded there as well. From 9:00 A.M. to 11:45 A.M. he was in a hospital conference room trying to console his wife.

At 11:45 A.M. Officer Untch told Worthington that he needed to talk with him about Susan's death. Upon being advised of his *Miranda* rights Worthington signed an advice of rights and waiver form. During the course of their forty–five minute interview (first statement) Worthington denied any knowledge as to what had happened to Susan in the bathroom. He merely stated that he saw Susan in the bathtub.

Following this interview Untch left the room for ten minutes. He told Worthington that he could leave to get "coffee or anything" and even explained where the lounge was. While he did not expressly tell Worthington that he could leave the hospital, Untch did testify that Worthington was free to leave the premises at any time since he was not a suspect in the investigation. When Untch returned the questioning began again (second statement).

In the second statement Worthington reiterated his version of the events leading up to Susan's death. This round of questioning lasted nearly an hour. Untch was assisted briefly by Detective Allen.

After another ten–minute break Untch, accompanied by Detective Chaddock, resumed the questioning (third statement). At one point Chaddock asked Worthington if he was covering up for his wife. Worthington replied that he would not answer any more questions. Nevertheless he continued to respond to further queries. Later Chaddock repeated his question about a cover–up. This time Worthington retorted, "If I was trying to cover up [sic] anything I would have a lawyer sitting here. I wouldn't answer no questions if I was trying to cover up [sic]." This third interview took an hour to conclude.

Afterwards Worthington drove to the police station to see his wife. Upon his arrival he was told by a clerk–typist to have a seat in the lobby and he remained there for four or five hours. Around 9:45 P.M. Detective Allen asked Worthington if he would answer some questions. Worthington agreed and was led into a conference room.

The first portion of their ensuing conversation was explained by Allen in this manner.

"Upon entering the conference room I asked Mr. Worthington if he had been

advised of his rights, and he stated that he had been informed of his rights several times and that he understood his rights. I at this point asked him if anyone had placed him under arrest or if he had been informed he was being detained. He said no, that he wasn't. I asked him at that time and indicated to him that our purpose at this point was to determine what happened in the residence, and this was the reason that I wanted to talk to him. Because he made mention at that time that he had talked to Detective Untch. I then informed him that he was not being detained, that he was not under arrest, that there was no accusations made in regard to him being involved in the incident, or his wife being involved in the incident."

Immediately thereafter Worthington agreed to give a formal statement and the advice of rights form was read to him. Worthington remarked that he was tired of lying and covering–up. It was at this point that he made the fourth statement. This statement took ninety minutes to complete and Worthington was given an opportunity to review it. In the course of his proofreading Worthington initialed the typographical errors found therein and signed his name at the bottom of each page.

Clearly there was sufficient evidence from which the trial court could conclude that the fourth statement was voluntary. The numerous factors cited in support of a contrary finding are merely attempts to reweigh the evidence. There is nothing in the record to indicate the combination of any of these factors to the extent necessary to impair the voluntariness of his statement.

▮ Several assignments of error relate to the refusal of the trial court to give certain instructions tendered by Worthington. One such instruction reads as follows:

"The jury is instructed that this Court has made a prior determination that the statements given to representatives of the Portage Police Department by the defendant, John D. Worthington, admitted into evidence during the course of this trial do not constitute a confession of the crime charged. The jury may give such statements such weight as you believe they deserve under all the circumstances of this case."

Worthington maintains that this instruction was crucial to his defense because it advised the jury that he could not be convicted on the basis of the fourth statement alone.

A confession is the admission of guilt by the defendant of all the necessary elements of the crime of which he is charged. *Green v. State* (1973), 159 Ind.App. 68, 304 N.E.2d 845; *Parsons v. State* (1975), 166 Ind.App. 152, 333 N.E.2d 871. Thus, an admission of facts composing the offense may constitute a confession. *State v. Cunningkin* (1953) Mo., 261 S.W.2d 85.

By tendering this instruction Worthington sought to advise the jury that the fourth statement standing alone did not admit all the material elements of the crime of child neglect. Whether the fourth statement may be termed a confession is a close question. Generally speaking, such determination is for the jury. *Shields v. State* (1974) 52 Ala.App. 690, 296 So.2d 786, *cert. denied* 292 Ala. 749, 296 So.2d 793; *Davis v. State* (1975) 234 Ga. 730, 218 S.E.2d 20. Accordingly, the instruction tendered was erroneous because it declares as a matter of law what ought to be left to the jury as a matter of fact. Moreover, the jury was informed in several other instructions to consider *all* the evidence in ascertaining Worthington's guilt. This would obviate the objection that the jury would examine only the fourth statement.

▮ Complaint is also made of the refusal to give Tendered Instruction No. 4 which stated:

"You the jury are hereby instructed that as a matter of law—Susan Worthington was, as of June 3, 1977 neither a dependent, neglected, battered nor abused child as was found by Court hearing."

As part of his case–in–chief Worthington adduced evidence that the Porter County Department of Public Welfare had petitioned the Porter County Superior Court to place Susan in its immediate custody. It also appears that a hearing was held on the matter and the court ordered that custody be returned to the Worthingtons. Subsequently, Worthington introduced a certified copy of the order referred to in Tendered Instruction No. 4. On appeal it is urged that the trial court had a duty to advise the jury as to the legal effect of that order. There was no error in rejecting this instruction for it would have improperly singled out a particular part of the evidence for emphasis in schooling the jury. *Lewis v. State* (1977), 266 Ind. 371, 363 N.E.2d 1230.

 Error is also claimed in the refusal to give an instruction stating that:

"You are instructed by the Court that photographs were admitted in evidence and shown to the jury in this case for the purpose of aiding the jury in determining certain facts.

"You are instructed, however, that you are not to permit these photographs to inflame your mind and that you should not, to any extent, permit the photographs to bias or prejudice you against the defendant. They are not in the record for that purpose. The defendant is entitled to your cool, calm and free deliberation, and the exhibits should be considered by you only for the purpose for which this Court has admitted them in evidence."

Worthington submits this instruction was necessary to eliminate the danger that the jury would allow the photographs of the decedent to inflame its passions and thereby convict him on that basis.

This assertion must be rejected as Worthington's tendered instruction was covered by other instructions given by the court. In general, Instructions Nos. 13, 19 and 25 apprised the jury that it should consider only the evidence in this case; that the law does not permit jurors to be governed by sympathy, prejudice or public opinion; that both the defendant and the State expect the jury to consider all the evidence carefully and impartially; and that the jury should put aside all sympathy and sentiment in returning its verdict.

 Worthington also contends the trial court was in error when it gave Instruction No. 21 which reads as follows:

"Any parent, guardian or person having the care, custody or control of any child need not have specific intent to commit the crime of neglect of a child, but merely allowing an act inconsistent with the child's well–being to be committed will support a conviction for neglect of a child."

The gist of his objection seems to be that the instruction does not address itself to his knowledge or lack thereof regarding Dorothy's abuse of Susan.

This contention is not well taken. Instruction No. 17 told the jury that before Worthington could be convicted it would have to find that he knowingly omitted to perform a duty required by law. When read in conjunction with Instruction No. 21 it is apparent that the subject of knowledge was adequately covered.[4] Furthermore, the fact that Instruction No. 21 was drawn from a case whose facts differed from those present in the instant case is of no consequence. The instruction was nonetheless a correct statement of the law, see *Eaglen v. State, supra,* footnote 4; *Hunter v. State, supra,* and there was evidence to support its submission.

 Worthington next urges that photographs of Susan taken shortly after her death should have been excluded because their probative value was outweighed by their prejudicial impact upon the jury. These photographs depicted multiple bruis-

4. Actually *Eaglen v. State* (1967), 249 Ind. 144, 231 N.E.2d 147 and the decisions following its authority recognize that lack of knowledge is not a defense to child neglect.

es over Susan's body. Testimony regarding the age of these bruises ranged from a few days to three weeks. Other evidence showed that the general appearance of the child's body as portrayed in the photographs would be the same as at the time of death.

A trial court is vested with broad discretion in ruling on the admissibility of photographic evidence. The test to be applied is whether the photographs are relevant to any material issue. *Talley v. State* (1980), Ind.App., 400 N.E.2d 1167. They are relevant if they evidence anything a witness would be permitted to testify about. *Bonner v. State* (1979), Ind., 392 N.E.2d 1169.

The photographs introduced at trial were relevant for the purpose of depicting the location and extent of the bruises on Susan's body. *Perkins v. State*, (1979), Ind. App., 392 N.E.2d 490. None of them can be characterized as gruesome. The fact that some of the bruises may have resulted from bumps or falls affects the weight of this evidence but not its admissibility. The argument that these photographs were prejudicial because they permitted an inference that Worthington either killed or participated in the murder of Susan is without foundation. Worthington was charged with child neglect not homicide. The State's theory was that Worthington had failed to act when required to by law. In no way was the question as to whether Worthington actively participated in the homicide before the jury. There was no abuse of discretion in admitting the photographs.

In the same vein Worthington asserts that evidence relating to prior acts of child abuse by Dorothy was inadmissible. He suggests that the prejudicial effect of this testimony overrode its probative value because there was no evidence indicating he was aware of these acts.

The challenged testimony related to the following circumstances: Vern Seaton and his companion, James Clark, were proceeding southward on Highway 51 near Dyersburg, Tennessee when they spotted Susan standing along the roadside, crying in a hysterical manner. Slowing their vehicle for fear that she would dart out in front of them, they eventually pulled over to the side of the road whereupon Dorothy alighted from the Worthington auto and began walking towards Susan. The duo offered their assistance but Dorothy declined, stating, "Just a spoiled seven year old brat, that's all."

As they proceeded onward the men noticed through the rearview mirror that Dorothy had landed a blow to Susan's head, the impact of which sent her reeling into a ditch. As Susan extricated herself Dorothy kicked her in the posterior. This kicking continued up to the moment Susan re—entered the car. Based on what they had seen Seaton and Clark were prompted to turn around and head for a nearby service station in order to call the police. When they passed by the Worthington auto the defendant glanced at them. At trial Worthington denied any knowledge of the incident, contending that he had closed his eyes to relax because of a headache.

Kay Johnson, who was Susan's first—grade teacher, testified that throughout the school year she observed numerous bruises on Susan's face. Around Christmas time she noticed a black and blue bruise above Susan's right eye. When the class went on a field trip in the spring she observed that Susan's face was badly bruised. An examination by the school nurse revealed several other bruises on her legs and the back of her arms. Judy Dahlstrom was Susan's bus driver. She testified that she too saw numerous bruises on Susan's face and neck in the course of the school year. Other testimony indicated that when Worthington worked the night shift he often dressed Susan for school. There was also evidence that Susan never got hurt and was not prone to bump into things.

Kevin Smith lived in a house behind the Worthingtons. In the early part of July 1977 he was playing in the backyard with

his dog when he heard Dorothy shout, "God Damn it, I told you not to do that." From a distance of about forty feet he saw Susan on her knees in a pool of water one foot deep. Dorothy was kneeling near the edge of the pool dunking Susan's head in the water. Smith estimated that she dunked Susan eleven or twelve times and held her head under water an average of four or five seconds per dunk. Smith observed that Worthington was sitting at a picnic table approximately ten feet from the pool and that he never moved from that position. Smith admitted that he did not know what Worthington was doing at that moment because he was not looking at him. Worthington had no recollection of the incident.

Rebecca Wherry was Dorothy's sister. While visiting the Worthingtons toward the end of January 1977 she heard a pounding noise in their bathroom. The vibration was such that plaques affixed to the wall were shaking. Upon entering the bathroom she saw Dorothy slamming Susan's head against a set of towels on the wall. The reason for this punishment was Susan's failure to get dressed in time. During this commotion Worthington drank a bottle of pop in the living room.

From the totality of the circumstances it was well within the province of the trier of fact to infer that Worthington possessed the requisite awareness. But even if he was unaware, that fact would not render the evidence inadmissible.

In *Eaglen v. State, supra,* footnote 4, the victim died of pneumonia secondary to malnutrition. Consequently, the defendant was convicted of involuntary manslaughter based on the underlying offense of neglect. In response to the contention that the defendant was unaware of the child's illness the court noted:

"Nor does it avail appellant to contend that he did not know, or could not tell, that Nolan was sick. The most cursory examination by an experienced parent would have revealed the sickly condition of the child; and if appellant failed to observe the obvious, it could only have resulted from his own negligence.

"In the 1914 English case of *Oakey v. Jackson* (1914), 1 KB (Eng.) 216, 6 BRC 460, Anno.Cas. 1916A 335, the King's Bench Division, in construing the meaning of the word 'neglect in a statute similar in import to § 10–813, *supra,* stated that:

'Neglect is the want of reasonable care–that is, the omission of such steps as a reasonable parent would take, such as are usually taken in the ordinary experience of mankind . . .'

"This language is equally applicable to this State's statutory definition of child neglect. Therefore, conceding, without deciding, that appellant had no actual knowledge that his child was extremely ill, since he could easily have become aware of that fact had he exercised his statutory duty, such a contention provides appellant no defense." 231 N.E.2d 147, at 150.

Thus, this decision held that the absence of actual knowledge is no defense because a parent has an affirmative duty to discover and act in a reasonable manner. Dereliction of that duty is neglect. The case mandated the courts to enforce minimum standards of care. See also *Smith v. State* (1980) Ind.App., 408 N.E.2d 614.

Here the evidence in question disclosed a continuing course of neglectful conduct on the part of Worthington, thus permitting the inference that he could have become aware of the abuse inflicted on Susan had he only exercised his statutory duty. It cannot be said that this evidence was unduly prejudicial.

 Worthington also asserts the trial court erred in permitting Dr. Azar to testify that in his opinion Susan's death was not accidental. This testimony was objected to on the grounds that Azar could not support his opinion with any facts based upon a reasonable degree of medical certainty.

Ordinarily, whether a witness is qualified to give an opinion as an expert is a matter within the sound discretion of the trial court. *Gary v. State* (1980), Ind.App., 400 N.E.2d 215. Moreover, where the expert is testifying from personal knowledge as opposed to hypothetically and has satisfied the court of his qualifications as an expert he may state his findings and the factual background for his opinion goes to the weight rather than the admissibility of the evidence. *Fischer v. State* (1974), 160 Ind.App. 641, 312 N.E.2d 904.

Azar was the pathologist at Porter Memorial Hospital and in the course of his duties had performed thousands of autopsies including one on the decedent. He testified that the cause of death was suffocation or asphyxiation. He further opined that the child did not meet her death by accidental means. He based this opinion on the distribution of bruises in time and space, observations from past cases as well as the absence of other significant findings that would contribute to death.

It was not an abuse of discretion to admit the disputed testimony. Azar conducted the autopsy and on the basis of his observations and experience as a pathologist could offer his opinion that the victim's death was not accidental in nature. The fact that his findings could also have supported alternative theories consistent with death by accidental means only affects the weight the evidence was entitled to receive from the jury.

Lastly, Worthington assails the judgment below on the grounds that the evidence was insufficient to establish child neglect. Where questions concerning the sufficiency of evidence are presented on appeal only that evidence which is most favorable to the State, together with all logical and reasonable inferences which may be drawn therefrom, will be examined. Furthermore, it is not the function of an appellate tribunal to weigh the evidence or determine the credibility of witnesses.

*Floyd v. State* (1980) Ind.App., 399 N.E.2d 449. The evidence, as set forth throughout this opinion, adequately supports the reasonable inference that Worthington, upon seeing his wife dunk Susan in the bathtub until her lips turned purple, should have done something more than sip a Pepsi and watch cartoons.

No reversible error having been demonstrated, the judgment of the trial court is affirmed.

Affirmed.

STATON, J., concurs.

GARRARD, P. J., concurs in result with opinion.

GARRARD, Presiding Judge, concurring in result.

I concur with the majority except for its analysis that IC 35–14–1–4 and IC 35–14–3–1 co–exist and are distinguished by the requirement of wilfulness in the latter.

I would instead find that IC 35–14–1–4 (Acts 1945, Ch. 218, § 4, as amended) is repugnant to IC 35–14–3–1 (Acts 1889, Ch. 201) and as such impliedly repealed the latter as it applies to "any person having the care, custody or control" of a minor.

While such repeals by implication are not favored, they should be found where the later is so repugnant to the earlier as to render them irreconcilable. *Lloyd v. State* (1979), Ind., 383 N.E.2d 1048; *Freyermuth v. State ex rel. Burns* (1936), 210 Ind. 235, 2 N.E.2d 399; *Pennsylvania Co. v. Dunlap* (1887), 112 Ind. 93, 13 N.E. 403.

As to that part I therefore concur in result.