William L. McMICHAEL, Sr., Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 4-684A148.

Court of Appeals of Indiana,
Fourth District.

Dec. 6, 1984.

Rehearing Denied Feb. 8, 1985.

Ronald K. Smith, Muncie, for appellant.

Linley E. Pearson, Atty. Gen., Lisa M. Paunicka, Deputy Atty. Gen., Indianapolis, for appellee.

MILLER, Presiding Judge.

William L. McMichael, Sr. was convicted of the criminal neglect of his dependent 22-month-old son, William L. McMichael, Jr. (Billy), for failure to provide adequate medical care. Billy died as a result of an abdominal trauma, which deteriorated into peritonitis, a condition the jury resolved should have been treated a significant time prior to death. McMichael claims such jury verdict was improperly swayed by two slides of Billy's body and was not supported by sufficient evidence. He also contends that, regardless of our decision with respect to the verdict, the trial court's four-year sentence was unjustifiable because it was based on improper considerations. We affirm both the verdict and the sentence.

ISSUES

1. Did the trial court err in admitting a pair of slides into evidence over McMichael's objection that they were gruesome in nature, served no purpose in proving or disproving any facts at issue, and were unduly prejudicial?

2. Was the evidence insufficient to sustain the jury's verdict that McMichael was guilty of neglect of a dependent?

3. Did the court's probation officer employ improper considerations in preparation of his recommendation of sentence, including the following: statements to McMichael that the probation officer considered this a case of murder; statements that McMichael's wife should have been charged with the offense; and asking McMichael if he would submit to a polygraph examination?

FACTS

On March 23, 1983, between 4:45 and 5:00 P.M., the Delaware County Ambulance Service responded to a call requesting assistance at the McMichael residence in Muncie. When the emergency medical personnel entered the home, they observed 22-month-old Billy lying naked on the floor with McMichael kneeling beside him. One paramedic noticed Billy's abdomen was grossly distended and bloated and that there were both old and recent bruises on his body, visible even in the semi-dark house. Determining from Billy's grayish color that he was not getting enough oxygen in his blood-stream, the emergency team established an airway into his trachea and transported the child to Ball Memorial Hospital. Billy died later that evening.

At trial, a pathology resident at Ball Memorial Hospital, Dr. Daniel House, testified to medical conclusions he had reached as a result of performing an autopsy on Billy's body. He observed multiple bruises over the major part of Billy's anatomy, including his face and head, all along his spine, and on his external genitalia. The other distinctive feature he found was the

massive swelling of Billy's abdomen, which was so swollen it was hard. Dr. House's examination of the inner body cavity itself revealed additional abnormalities. He discovered Billy's abdomen contained about one-half quart of a bloody, foul-smelling liquid where normally no liquid is present. Further examination revealed the source of this liquid was an infection (peritonitis) resulting from the irritation and inflammation of the intestinal tissues by digestive juices escaping through two perforations in Billy's small intestine. Dr. House testified the perforations had probably been caused by a blow to Billy's abdomen, the severity of which caused his small intestine to be twice pierced by his spine and his left kidney to be bruised. As a result of the infection's fluid having nowhere to go, Billy's abdomen swelled. He further testified the peritonitis was a chronic type, having existed for more than 48 hours prior to death.

As for the symptoms of the infection, Dr. House stated that for the first twelve hours from its onset, the victim would run a high fever and vomit continuously. After the vomiting stops, the victim has no desire to eat but within the next twelve hours, his abdomen will begin to cause increasing discomfort and will swell. The pain would be so great that a child would not want to move and would resist efforts to make him do so. After 24 hours, the victim's abdomen will increasingly distend, and the victim will often experience muscle spasms in the abdomen. As for combatting the peritonitis itself, Dr. House explained that the best chance of survival exists within the first twelve hours, and he likened the damage to the intestine to a prolonged chemical burning of its surface. He explained that treatment is more difficult after the first twelve hours but not impossible. Succinctly then, Dr. House pronounced the cause of Billy's death was a blow to his abdomen, perforating his small intestine and resulting in a peritonitis (abdominal infection) over 48 hours old and sepsis (infection of whole body).

In his defense, McMichael called forth several character witnesses then took the stand himself. He described how he acquired custody of Billy, as well as his older sister, from his ex-wife. He had had a doctor check the children over because of visible signs of abuse inflicted by his former wife. He said that in the four or five months he had had custody, he attempted to maintain Billy's health by giving him vitamins and juices but noticed that he bruised easily, such that the bruises on Billy's body at his death were allegedly the result of McMichael's efforts to dislodge a hot dog choking him. In the morning of March 22, the day before Billy died, McMichael noticed Billy's abdomen was swelling and that his trousers no longer fit. By that afternoon, McMichael had acknowledged to himself that Billy was also vomiting and was sitting very still and realized he would need medical attention but he wanted to wait until the next day to have him examined by a doctor. In the meanwhile, he attempted to reduce Billy's abdominal swelling with ice packs, alcohol rubs, liniment and warm baths. It was while attempting to administer one of these warm baths, on March 23, that McMichael left Billy unattended for a few moments and returned to find him lying in the tub. McMichael pulled Billy out of the water, realized he was having difficulty breathing, and telephoned his wife, Dixie, for aid. After attempting mouth-to-mouth resuscitation and cardio-pulmonary resuscitation at Dixie's instruction, McMichael called her back and asked that she contact an ambulance. The subsequent events were as described above.

## DECISION

*Slides*

■ During Dr. House's testimony, the State displayed projections of two slides, Exhibits 3 and 4, taken of Billy after his death. Exhibit 3 is a photographic death mask by which Dr. House identified Billy as the subject upon which he had conducted an autopsy. The other slide, Exhibit 4, is a close-up external view of Billy's abdomen, showing its gross distension and its numer-

ous bruises. McMichael objected to their presentation on the grounds they were gruesome, irrelevant, and cumulative of two other photographs, their evidentiary weight thereby being merely prejudicial. We see no error.

■■■ It is of well-established legal principle that the admission of photographic evidence at trial is within a trial court's discretion, subject to appellate reversal only for an abuse thereof. *Bray v. State*, (1982) Ind., 430 N.E.2d 1162; *Talley v. State*, (1980) Ind.App., 400 N.E.2d 1167. To determine whether such abuse has occurred, we must determine first whether the photographs are relevant—do they portray a material fact to which a witness may testify? *Id.* Upon a determination of such relevancy, photographs may then be weeded out if their gruesomeness would outweigh their relevance in the minds of the jurors. *Bonner v. State*, (1979) 271 Ind. 388, 392 N.E.2d 1169. In the instant case, the two slides pass both tests.

First of all, Dr. House testified both photographs were taken during preliminary stages of the autopsy proceedings. Exhibit 3, Billy's face, was identified by Dr. House as the subject of the autopsy about which he was testifying. Exhibit 4 was taken for the specific purposes of demonstrating the two very apparent abnormalities in Billy's anatomy—the pattern of bruises and the swelling with its consequent tenseness of Billy's abdomen. Both these bits of evidence would have been proper verbal testimony because they established facts material to the case against McMichael, the identity of the victim and the very apparent symptoms of Billy's ill-health which should have alerted his father to seek proper medical aid. This evidence was relevant; thus, so were the photographs.

The second step of this relevancy review clearly indicates these photographs were not gruesome. We admit their viewing is sad and painful, but their unpleasantness does not make them gruesome. *See, e.g., Bonner v. State, supra,* 271 Ind. 388, 392 N.E.2d 1169. We therefore dispose of the gruesomeness and irrelevancy arguments

of McMichael. *See Worthington v. State,* (1980) Ind.App., 409 N.E.2d 1261 (photographs as evidence of neglect of child relevant and not gruesome).

■■■ As for McMichael's contention the slides are cumulative of other exhibits, we again find no error. Exhibits 1 and 2 are full-length photographs (not slides) of Billy's naked body on a backboard, lying on a hospital bed. One of the paramedics answering the call to the McMichael residence identified the pictures as representing the child she tended on March 23. She testified she was not certain whether she was present when the shots were taken but that they accurately depicted the child. On the other hand, Exhibits 3 and 4 were only of two specific parts of Billy's anatomy, his head and his abdomen, taken for autopsy purposes. We fail to see how these four exhibits could be cumulative because they were intended to fulfill different evidentiary purposes from two different witnesses, one of whom took the slides for his own professional investigation. In the absence of cumulation, there could be no prejudice. *See Mingle v. State,* (1979) Ind.App., 396 N.E.2d 399 (photographs of various portions of child's anatomy were not repetitive in trial for cruelty to infant.)

*Sufficiency of the Evidence*

■■ McMichael next attacks the sufficiency of the evidence supporting the jury's verdict. Most specifically he attacks any finding that he knowingly or intentionally "placed" Billy in any situation endangering his health. Our review of the law and of the facts reveals otherwise.

McMichael was charged under IND. CODE 35–46–1–4:

"(a) A person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally:

(1) places the dependent in a situation that may endanger his life or health

. . . .

\* \* \* \* \* \*

commits neglect of a dependent, a Class D felony...."

Specifically, the State charged McMichael with endangering Billy's life by not seeking necessary medical attention. The record reveals sufficient direct and circumstantial evidence of probative value and in favor of the State's case for us to reasonably conclude that the jury's conclusion was correct. *See, e.g., Choate v. State,* (1984) Ind., 462 N.E.2d 1037 (standard of review).

McMichael became admittedly aware of Billy's ill-health at least 30 hours prior to his death. According to the pathologist's testimony, Billy should have (and indeed he had) exhibited symptoms of a severe problem by vomiting, running a fever, refusing to move to avoid discomfort, and showing an increasing abdominal swelling. McMichael acknowledged he had considered taking Billy to a doctor 24 hours prior to decease but had decided to wait. We find that these facts lead to the inexorable conclusion that McMichael knowingly placed Billy in a life-threatening situation by failing to seek necessary medical attention for what can only be described as a very apparent and very serious illness. The jury properly found him guilty of neglect of a dependent. *See Eaglen v. State,* (1967) 294 Ind. 144, 231 N.E.2d 147 (involuntary manslaughter for failure to provide medical attention to child); *Ware v. State,* (1982) Ind.App., 441 N.E.2d 20; *Smith v. State,* (1980) Ind.App., 408 N.E.2d 614; *Perkins v. State,* (1979) 181 Ind.App. 461, 392 N.E.2d 490 (neglect of a dependent based on child's death caused by blow to abdomen and failure to provide medical attention).[1] McMichael's principle contention is that, irrespective of the favorable evidence, the jury could not have reasonably found he had "knowingly" neglected Billy. On the contrary, we believe the evidence and the reasonable inferences therefrom clearly show McMichael acted knowingly.

The level of culpability required when a child neglect statute requires a finding of "knowing" behavior is that level where "the accused must have been subjectively aware of a high probability that he placed the dependent in a dangerous situation." *Ware v. State, supra,* 441 N.E.2d at 23. Because such a finding requires one to resort to inferential reasoning to ascertain the defendant's mental state, the appellate courts must look to all the surrounding circumstances of a case to determine if a guilty verdict is proper. *Perkins v. State, supra,* 181 Ind.App. 461, 392 N.E.2d 490. In McMichael's case, the totality of the circumstances (as we have recited them above) indicates that McMichael was aware of a high probability that, by failing to obtain medical care, he was placing Billy in a dangerous situation.[2] McMichael may

1. McMichael presented no defense with regard to IND.CODE 35-46-1-4, where one may argue the failure to seek medical care is attributable to one's legitimate religious beliefs that prayer will heal the child's illness.

2. We are aware that there is a conflict in this court with regard to defining "knowingly" in child neglect statutes. The Second and Third Districts adhere to our classic subjective usage of "knowingly" as applied throughout the criminal code and as we have adopted above. *See Ware v. State,* (1982) Ind.App., 441 N.E.2d 20 (Second District); *Perkins v. State,* (1979) 181 Ind.App. 461, 392 N.E.2d 490 (Third District). However, the First District, relying on an involuntary manslaughter case from our supreme court (*Eaglen v. State,* (1967) 249 Ind. 144, 231 N.E.2d 147), has applied an objective standard of intent by requiring the State "to prove that the defendant parent was aware of facts that would alert a reasonable parent under the circumstances to take affirmative action to protect the child." *Smith v. State,* (1980) Ind.App., 408 N.E.2d 614, 621. In *Smith v. State,* the court determined a mother was guilty of neglect of her child when she failed to remove him from a household where mother's live-in boyfriend abused the boy. The court relied upon *Eaglen v. State,* wherein a child neglect provision without an intent element was defined, and applied it to the child neglect statute which parallels the one here. *See* IND.CODE 35-46-1-4 (1980 Supp.). However, we believe the *Smith* court was attempting to define the *actus reus* of our neglect statute rather than the *mens rea* element. *See Carter v. State,* (1980) Ind.App., 408 N.E.2d 790 (defining *actus reus* and *mens rea* ).

The *mens rea,* or evil intent, element of IND. CODE 35-46-1-4, requires a finding of either knowing or intentional behavior. We believe the better approach to defining this factor is to adopt those definitions generally used in our criminal statutes. *See Ware v. State, supra,* 441 N.E.2d 20. The difficulty the *Smith* court en-

argue all he wants that Billy had had this condition before but had recovered without medical attention and any other exculpatory evidence, but we may not reweigh the evidence nor reassess the credibility of witnesses. We must rely only upon the substantial evidence most favorable to the verdict. *See Choate v. State, supra,* 462 N.E.2d 1037. We are thus compelled to conclude the jury was correct.

*Presentence Report*

McMichael contends that he was deprived of the right to a neutral presentence report because of improper questioning by his probation officer. He particularly claims that the officer alluded to photographs not admitted at trial, asked McMichael's current wife why she had not been jointly charged, tried to get McMichael to change his story by stating he believed Billy's death was by murder, and requested McMichael take a polygraph test. None of these allegations are supported by the presentence report itself; all it recommends is that McMichael be given a four-year executed sentence due to the aggravating circumstance that Billy ultimately died as a result of the neglect. The trial court noted McMichael's claims:

"THE COURT: Thank you. For the record in cause number C–83/16, State of Indiana versus William McMichael, Sr. note that this Court is paying no attention to: 1) Any pictures that Mr. Thompson, Probation Officer of this Court may have shown Mr. McMichaels [sic]. This Court did not see those pictures nor is it aware of those pictures. 2) Note that the Court pays no attention to a polygraph as the able Defense counsel is well aware. That is not admissible into evidence unless it is in fact done by joint stipulation of the parties. So the Court will pay no attention to any of those comments and have them deleted from the Probation Department, the Probation Officer's recommendation. However, the Court is paying attention to the rest of the pre-sentence report as to the factual basis with the further exception that any references to the fact that if that is a fact that the defendant's wife, why wasn't she charged with murder, the Court is not, nor with murder or with this offense, the Court is paying no attention to that. That is deleted if it is included anywhere or the fact that, anything dealing with the fact other than the actual charge itself, that being neglect of a dependent, a class D felony."

Record, pp. 285–86. We see no error here.

 We agree with McMichael's charge that a presentence report should be a theoretically neutral investigation of a defendant with an equally neutral evaluation. *See, e.g., Gardner v. State,* (1979) 270 Ind. 627, 388 N.E.2d 513. We do not perceive this report here as being anything but neutral, and the trial court declared it would not consider this improper criteria even if present. We see no error. *See Lang v. State,* (1984) Ind., 461 N.E.2d 1110 ("we find no actual prejudice to defendant as the trial court did not adopt either of the

countered was in defining the *actus reus,* or evil act, element: "plac[ing] the dependent in a situation that may endanger his life or health." I.C. 35–46–1–4 (1980 Supp.). The court evidently did not perceive the facts of the case to support any affirmative *action* on the mother's part that endangered her child such as to find she had "placed" him in a dangerous position. Rather, the court interpreted an affirmative duty to *avoid* such circumstances from language in *Eaglen v. State, supra,* which interpreted the predecessor statute of neglect where a parent is guilty for "failure to do or permit to be done any act necessary for the child's physical or moral well-being." IND.ANN.STAT. § 10–813 (1956). In doing so, *Eaglen* relied upon a definition of neglect as "a want of reasonable care," thereby encompassing both affirmative acts and passive inaction. The *Smith* court then applied this reasoning to require only an objective inquiry into whether a parent was aware of facts that would have caused a reasonable parent to act. We believe this tortures the language of I.C. 35–46–1–4. Although we readily agree that the *actus reus* of the statute, by using the term "places," seems to require a finding of some affirmative action endangering a child, we believe that both action and inaction can "place" a child in an undesirable position, not in an affirmative sense necessarily but by inadequately performing one's affirmative duty of reasonable care. Thus, we do not disagree with the *Smith* court on the law itself just its application to the mental intent element of the statute.

probation officer's recommendations for sentencing and did give sufficient reasons for the sentence finally imposed." Id. at 1115).

*Sentencing*

██ McMichael attacks his four-year sentence, alleging it is excessive, unreasonable and based upon improper considerations. He is especially and vehemently opposed to having a determinate two-year term for a Class D felony (IND.CODE 35–50–2–7) increased by two years. He argues the trial court improperly found one aggravating circumstance (Billy's death) outweighed the mitigating circumstances (lack of prior criminal record and hardship to McMichael's remaining dependents). His most strenuous argument is that the enhancement of his sentence by reason of Billy's death is, in essence, a sentence for a greater offense of which he was not convicted. The trial court committed no error.

The factors a trial court may consider in enhancing a determinate sentence are found at IND.CODE 35–38–1–7 (1983 Supp.). Among those factors are "the nature and circumstances of the crime committed." I.C. 35–38–1–7(a)(2); *Owens v. State*, (1981) Ind., 427 N.E.2d 880; *McNew v. State*, (1979) 271 Ind. 214, 391 N.E.2d 607. In this case, we believe the trial court correctly found that Billy's death was an aggravating consideration, arising from the general circumstances of the crime itself.

██ It is not unusual for trial courts to consider the crime's effect on the victim when enhancing a sentence. *See e.g., Nunn v. State*, (1983) Ind., 450 N.E.2d 495; *Robinson v. State*, (1983) Ind., 446 N.E.2d 1287; *Abercrombie v. State*, (1982) Ind., 441 N.E.2d 442; *McNew v. State, supra*, 271 Ind. 214, 391 N.E.2d 607; *see also Mingle v. State, supra*, 396 N.E.2d 399. However, McMichael contends that sentencing him for Billy's death is improper when he was not convicted of a greater offense than child neglect, which would have encompassed his death as a element. There are no limitations on what a court may consider in enhancing a sentence, even if such factor may have also led to a conviction on a greater charge. *Lang v. State, supra*, 461 N.E.2d 1110 (conviction for Class A felony; sentencing considerations included injury to victim which had elevated to Class A felony to begin with); *Robinson v. State, supra*, 446 N.E.2d 1287 (sentencing included factor of serious bodily harm to victim although only convicted of Class B child molesting). We find no impropriety in the court's procedure.

██ McMichael further argues that two mitigating circumstances—lack of prior criminal record and hardship on his family—should have accounted for more in the court's deliberations. A finding of mitigating circumstances is discretionary, *Cornelius v. State*, (1981) Ind., 425 N.E.2d 616, and considering the length of McMichael's sentence and the fact that Billy died, we are hardly in any position to say the trial court abused its discretion when the sentence is authorized by statute and is not manifestly unreasonable. *See Abercrombie v. State, supra*, 441 N.E.2d 442.

Affirmed as to all things.

CONOVER and YOUNG, JJ., concur.