## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 02 2017, 6:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Frederick Vaiana
Voyles Zahn & Paul
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Diamond Miller,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

May 2, 2017

Court of Appeals Case No.
49A02-1610-CR-2364

Appeal from the Marion Superior Court

The Honorable Mark D. Stoner, Judge

Trial Court Cause No.
49G06-1411-F1-52295

**Baker, Judge.**

[1] Diamond Miller appeals her conviction for Level 1 Felony Neglect of a Dependent Resulting in Death,[1] arguing that the evidence is insufficient. Finding the evidence sufficient, we affirm.

## Facts

[2] Miller's son, E.P., was born on February 5, 2013. In December 2013, Miller and E.P. moved in with Miller's boyfriend, Frank Larkins. Miller's father, William Miller, regularly helped with childcare while Miller was at work. Between December 2013 and October 2014, William frequently observed bruises on E.P.'s legs, hips, and face.

[3] On October 24, 2014, Miller took E.P. and her other child to William so that he could babysit while she worked over the weekend. During the weekend, E.P. ate normally, played with other children, and showed no signs of illness. On October 27, 2014, around 4:30 p.m., Miller and Larkins retrieved E.P. and his sibling. William observed Larkins look back at E.P. in the backseat and E.P. was visibly "spooked" and looked "like he seen [sic] a ghost." Tr. Vol. III p. 18-19. Larkins left with E.P. in his vehicle while William took Miller to work. Miller believed that E.P. was fine when she left him with Larkins for the day.

[4] Miller returned home that evening at approximately 10:00 p.m. She called William around 11:00 p.m. to ask what E.P. had eaten over the weekend,

---

[1] Ind. Code § 35-46-1-4.

telling William that E.P. had been complaining of stomach pain and did not want to eat.

[5] E.P.'s symptoms worsened throughout the night of October 27 and the day of October 28. He had severe stomach pain and vomited repeatedly; he could not keep down any liquids. E.P. was in such pain that he attempted to avoid any type of movement and could not sleep because of the pain. Miller heard him groaning as he attempted to sleep; she fell asleep to the sound of her child moaning in pain. Miller did not seek any medical treatment, hoping the symptoms would subside by Wednesday.

[6] Around 7:30 a.m. the morning of Wednesday, October 29, Miller awoke to find E.P. cold and limp. Emergency officials were called and a paramedic arrived to find Larkins administering chest compressions on the child. The paramedic discovered that E.P.'s body was cold and stiff, consistent with rigor mortis; the child was dead. The paramedic testified that the extent of the child's rigor mortis led him to believe that E.P. had been dead for an extended period of time.

[7] Dr. Thomas Sozio performed an autopsy on E.P.'s body. He noticed that E.P.'s left cheek was swollen, he had a small abrasion around his chin, a bruise on his right forearm, and a scratch on his chest. When Dr. Sozio conducted his internal examination, he discovered that E.P.'s duodenum—the passage tube leading from his stomach to his small intestine—had been severed. E.P.'s pancreas had also suffered damage. As a result of the severing of the

duodenum, bacteria from the intestines leaked into E.P.'s abdominal cavity, causing an infection called peritonitis. E.P.'s abdominal lymph nodes were enlarged and Dr. Sozio found blood in his abdominal cavity. The infection eventually turned into sepsis, causing the toddler's death.

[8] Dr. Sozio and Dr. Tara Harris—a board certified child abuse pediatrician for Riley Hospital for Children—testified as to the cause of E.P.'s internal injuries. Dr. Sozio stated that this type of injury is consistent with those suffered by patients in high speed car accidents. Dr. Harris testified that a "really high force trauma" to E.P.'s abdomen pushed his internal organs all the way back to his spinal vertebrae, lacerating the connection between E.P.'s stomach and intestines. Tr. Vol. II p. 84-85. Dr. Harris stated that this injury could not have been caused by E.P. falling or engaging in normal toddler activities.

[9] Dr. Harris testified regarding the likely progression of E.P.'s symptoms after suffering this trauma. Immediately after the impact, E.P. would have been crying and indicating pain in his abdomen. The injury would have caused increasing abdominal pain that would be amplified with any movement, causing the child to try to be still to avoid any movement. E.P. would not have been able to digest any substances, forcing vomiting, which would have caused intensifying pain. The building infection would have caused his stomach to increasingly bloat until it was very tense. Both Dr. Harris and Dr. Sozio testified that if E.P. had received timely medical care, he could have had surgery to repair his injuries and treat the infection. Dr. Harris testified that E.P. should have received medical attention because his symptoms kept

"getting worse, not better, that he was very thirsty but then couldn't keep anything down and progressively having abdominal distention, moaning, becoming less engaged." Tr. Vol. III p. 129-30.

On November 20, 2014, the State charged Miller with two counts of Level 1 felony neglect of a dependent resulting in death and two counts of Level 5 felony neglect of a dependent resulting in serious bodily injury. The State later dismissed the two Level 5 felony charges. Following a jury trial, the jury found Miller guilty of one of the Level 1 felony charges and not guilty of the other. On September 23, 2016, the trial court sentenced Miller to twenty years imprisonment, with fifteen years to be served in the Department of Correction and five years to be served on work release. Miller now appeals.

## Discussion and Decision

Miller's sole argument on appeal is that the evidence is insufficient to support the conviction. When reviewing a claim of insufficient evidence, we will consider only the evidence and reasonable inferences that support the conviction. *Gray v. State*, 957 N.E.2d 171, 174 (Ind. 2011). We will affirm if, based on the evidence and inferences, a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009).

To convict Miller of Level 1 felony neglect of a dependent resulting in death, the State was required to prove beyond a reasonable doubt that she knowingly or intentionally placed E.P. in a situation that endangered his life or health,

resulting in E.P.'s death.  I.C. §§ 35-46-1-4(a), -4(b)(3).  The jury found that Miller's failure to seek medical care for E.P. endangered his life and caused his death.  Miller contends that the evidence in the record does not establish that she acted knowingly.  In the context of a neglect conviction resulting from the alleged failure to provide timely medical care, it has been established that "[w]hen there are symptoms from which the average layperson would have detected a serious problem necessitating medical attention, it is reasonable for the jury to infer that the defendant knowingly neglected the dependent." *Mitchell v. State*, 726 N.E.2d 1228, 1240 (Ind. 2000), *abrogated on other grounds*, 924 N.E.2d 643 (Ind. 2010).

[13]  Miller insists that the evidence establishes only that her child was vomiting and feeling unwell, and that a reasonable parent would not necessarily have sought medical attention within the first twenty-four hours of such symptoms.  The record readily reveals symptoms far beyond vomiting, however:

- Monday night, E.P. did not want to eat, was complaining of stomach pain, and was lethargic and sleepy.
- Throughout the day on Tuesday, E.P.'s pain worsened.  He was thirsty and attempted to drink fluids, but vomited up everything he took in.
- Dr. Harris testified that throughout this time, E.P.'s pain and discomfort would have escalated, causing him to cry and try to be as still as possible, which Miller testified that, in fact, he did.
- Tuesday night, Miller observed that E.P. could not sleep because of his pain and heard him groaning as he remained motionless to control the pain.  She fell asleep that night to the sound of his moans.
- Dr. Harris testified that throughout this period, E.P.'s abdomen would have become more and more bloated until it was visibly bloated and very

tense. That was, in fact, the state of his abdomen when the paramedic found the child dead on Wednesday morning.

We agree with Miller that, if vomiting had been E.P.'s only symptom, a conviction for neglect would likely be unwarranted. Here, however, the jury reasonably rejected that argument, concluding that E.P. had many other troubling symptoms that would have caused an average layperson to seek medical treatment for the child.

[14] In *McMichael v. State*, we considered a very similar situation. 471 N.E.2d 726, 728-29 (Ind. Ct. App. 1984). In that case, a toddler died after exhibiting symptoms of peritonitis—the same infection E.P. suffered—and the defendant had failed to secure medical treatment. The child in that case exhibited nearly identical symptoms to E.P.—consistent vomiting, no desire to eat, swelling abdomen, and extraordinary stomach pain. *Id.* at 729. This Court held that, given those symptoms, the defendant "was aware of a high probability that by failing to obtain medical care, he was placing [his child] in a dangerous situation." *Id.* at 731. Here, likewise, the jury reasonably reached the same conclusion.

[15] Ultimately, whether a parent's failure to provide medical care for an ailing child constitutes criminal neglect is a question for the jury to answer. *Lush v. State*, 783 N.E.2d 1191, 1198 (Ind. Ct. App. 2003). We must simply determine whether their answer was reasonable. Given the evidence in the record here regarding E.P.'s serious symptoms, we find that a reasonable jury could have

found that Miller knowingly placed E.P. in a situation that endangered his life, resulting in his death. The evidence is sufficient.

[16] The judgment of the trial court is affirmed and remanded with instructions to ensure that the records in both Miller's and Larkins's cases are complete.[2]

Barnes, J., and Crone, J., concur.

---

[2] The State explains that Larkins and Miller were tried jointly (Larkins faced charges of murder, aggravated battery, battery resulting in death to a person less than fourteen, and two counts of neglect of a dependent resulting in death). In Miller's case, the trial court admitted statements made by both Miller and Larkins, but the exhibit volume contains only the recording of Larkins's statement. In the exhibit volume where Miller's statement should have been placed is a notation indicating that the disk containing the statement was placed in the record of Larkins's appeal, which is currently pending. Counsel for the State was able to obtain both statements for this appeal, but suggested that we remand the two exhibit volumes—from both cases—to the trial court so that it can ensure that both statements are present in the records of both cases. We agree, and so remand.