Marietta **SLUSHER** and Frank Slusher, **Defendants-Appellants,**

v.

**STATE of Indiana, Plaintiff-Appellee.**

No. 3–381A84.

Court of Appeals of Indiana, Third District.

June 30, 1982.

Rehearing Denied Aug. 18, 1982.

Bernard M. Tetek, Gerald N. Svetanoff, Gary, William G. Conover, Valparaiso, for defendants-appellants.

Linley E. Pearson, Atty. Gen., Thomas D. Quigley, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

GARRARD, Judge.

The appellants, husband and wife (Slushers) were the owners of an apartment house. Despite complaints and warnings about the deteriorated condition of the stairs and landings which constituted the rear access to the apartments, Slushers did nothing substantial to repair or replace the stairs and landings although they indicated they were planning to install a metal unit.

On May 7, 1979, while a social guest of one of the third floor tenants, Laureen Olsen went out upon the rear porch of the apartment. When she leaned against the railing it gave way and she fell to the ground below. A week later she died from injuries sustained in the fall.

Upon these events the Slushers were indicted and convicted of reckless homicide. On appeal Slushers challenge the sufficiency of both the indictment and the evidence.

Their argument challenging the evidence addresses the question of whether the evidence established that they had a common law duty to the deceased which could serve as the necessary predicate for criminal liability.[1] We agree with the state that

---

1. IC 35-41-2-1(a) provides in part that, "[A] person who omits to perform an act commits an offense only if he has a statutory, common law, or contractual duty to perform the act." It is conceded that in the present case there was no statutory or contractual duty.

a common law duty was imposed upon the landlords.

The Slushers had a duty to maintain in safe condition the common stairways and other parts of the building used in common by tenants and over which the landlords retained control. *Rossow v. Jones* (1980), Ind.App., 404 N.E.2d 12. *See also Tippecanoe Loan & Trust Co. v. Jester* (1913), 180 Ind. 357, 101 N.E. 915; *Coleman v. DeMoss* (1969), 144 Ind.App. 408, 246 N.E.2d 483; *Restatement (Second) of Property, Landlord & Tenant* § 17.3 at 189 (1977); *Restatement (Second) of Torts* § 360 at 250 (1965); Prosser, *Law of Torts* (4th Ed. 1971) § 63 at 405–408.

■ A landlord's duty to maintain common areas in a safe condition extends to business visitors and social guests of a tenant, for the duties and liabilities of a landlord to business visitors and social guests of a tenant are the same as those which the landlord owes to the tenant. *Town of Kirklin v. Everman* (1940), 217 Ind. 683, 689, 28 N.E.2d 73, 75, *modified on other grounds* 217 Ind. 692, 29 N.E.2d 206. Professor Prosser observed that the duty to maintain common areas retained under the landlord's control in a safe condition "extends also to members of the tenant's family, his employees, his invitees, his guests, and others on the land in the right of the tenant, since their presence is a part of the normal use of the premises for which the lessor holds them open." (footnotes omitted) Prosser, *supra*, § 63 at 406. The justification for extending the landlord's duty to third persons lawfully upon the leased property was stated persuasively by the American Law Institute:

> "If the terms of the lease entitle the lessee to permit third persons to come upon the part of the land retained within the lessor's control, it is immaterial whether they come as invitees of the lessee or as his licensees. It is the lessor's business, as such, to afford his lessee facilities for receiving all persons whom he chooses to admit for any legitimate purpose. Therefore, a person who, as between himself and the lessee, is a licensee

enters the land on a matter directly connected with the business of the lessor. He is, therefore, entitled to expect that the lessor will exercise reasonable care to discover and remedy any condition which makes his acceptance of the lessee's license dangerous to him."

*Restatement (Second) of Torts* § 360, comment f. at 253 (1965).

The Slushers have not seriously disputed this statement of the law. Instead, the gist of their argument is that on the day of Olsen's fall, Novick was merely a tenant at sufferance in the building, and therefore neither she nor her guests were entitled to the rights afforded *bona fide* tenants. They assert that Olsen's legal status on the day of her fall should be that of a mere licensee upon the property of another, and that accordingly, as to her, the landlords had no duty to safely maintain the premises. *See, e.g., Olson v. Kushner* (1965), 138 Ind.App. 73, 211 N.E.2d 620; *Standard Oil Co. of Ind., Inc. v. Scoville* (1961), 132 Ind. App. 521, 175 N.E.2d 711.

The basis for this contention arises from the facts adduced at trial. It appears that Novick rented the apartment on January 3, 1979 for $250 per month, apparently on a month-to-month tenancy. Sometime before March 21, 1979, Novick discontinued paying rent because she felt the apartment was uninhabitable due to a number of uncorrected defects, including the state of the rear stairways and landings. Slushers then instituted ejectment proceedings in the Lake County Court and on May 1, 1979 the court, pursuant to Novick's agreement to vacate by May 5th, entered an ejectment order to that effect.

The day before Novick was to have vacated the Slusher apartment she discovered the apartment she had planned to move to was not going to be available. She advised Mrs. Slusher of this development and asked if she could remain in Slushers' apartment until she and her children could find another place to live. Mrs. Slusher responded, "Just find another place and get out by the end of the month." Two days later Olsen fell from the third floor porch.

In view of Indiana's continued adherence to the invitee-licensee-trespasser determinants of a landowner's duty, we do not dispute Slushers' assertion that if Novick was only a tenant at sufferance, they did not have a duty to make the premises safe for Novick's visitors. As stated in § 360 of the *Restatement Second of Torts*, *supra*, the duty to a lessee's visitors is imposed because it is the lessor's business to afford the lessee the uses of the tenancy. That is not true of a tenancy at sufferance where the tenant has no right to possession. *See Coomler v. Hefner* (1882), 86 Ind. 108.

However, where the tenant has the express permission of the landowner a tenancy at sufferance does not arise. *Coomler, supra.* At minimum a tenancy at will is created, and the nonconsensual basis for defeating the existence of the landlord's duty no longer exists.

Thus, while one may inquire whether the law should impose criminal responsibility upon the basis of such finely threaded points of law, we have no doubt that under the facts, a duty to make the premises reasonably safe was indeed owed by the landlords. It is the very existence of that duty which evokes our concern in this kind of a prosecution.

We are concerned that our citizens not be subject to prosecution and conviction of a felony offense, most especially a homicide, for conduct which is merely *negligent*. We believe the legislature was of the same mind in enacting the new criminal code even though, admittedly, it moves us considerably closer to the civil law approach to crimes.

IC 35–41–2–1(a) mandates that "[a] person commits an offense only if he voluntarily engaged in conduct in violation of the statute defining the offense." The Study Commission's comments to this section quote with approval from both Jerome Hall [2] and Dean Pound: [3]

"[T]he harm forbidden in a penal law must be imputed to any normal adult who voluntarily commits it with criminal intent . . . ."

"Historically, our substantive criminal law is based upon a theory of punishing the vicious will. It postulates a free agent confronted with a choice between doing right and doing wrong and choosing freely to do wrong."

The cited statutory section continues by stating:

"However, a person who omits to perform an act commits an offense only if he has a statutory, common law, or contractual duty to perform the act."

It should be noted that these two statements from the code do not appear as separate sections or even separate paragraphs of the statute. They should, accordingly, be construed together. Thus, the omitting actor must both violate a duty and "voluntarily" engage in the omission which constitutes the breach.

Secondly, in various provisions the code imposes criminal responsibility upon one who acts "recklessly." IC 35–41–2–2(c) provides a general definition of that term. It states:

"A person engages in conduct 'recklessly' if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct."

"Plain" ordinarily means "open" or "obvious," and its use in the statute implies an objective standard. "Conscious" means "knowing" or "aware" and thus adds a subjective standard. We take "unjustifiable" then to add "without a legal justification" to the definition. The first half of the definition therefore requires a disregard of potential harm on both a subjective and an objective basis while the actor is engaging in conduct, and while the conduct is without justification in the law.

In addition, in order to act recklessly the statute mandates that the disregard "in-

---

2. Hall, *General Principles of Criminal Law* (2nd Ed. 1960) at 18.

3. Pound, *Introduction to Sayre, Criminal Law* (1927).

volves a substantial deviation from acceptable standards of conduct."

The Study Commission comments indicate that this phrase "makes it clear the criminal recklessness is not the same recklessness which insures tort liability." Accepting this intent on the part of the commission does little to provide insight into what constitutes a *substantial* deviation and what authority is to determine an acceptable standard of conduct for criminal, as opposed to civil, liability purposes.

The commission went on to say, in part, that "recklessness differs from negligence in that in the latter the actor *is completely unaware* of the dangerousness of his behavior although actually it was unreasonably increasing the risk of the occurrence of a proscribed harm." (emphasis added) (West's Anno.Ind.Code, Annotation to IC 35–41–2–2, p. 117.) We suggest that the commission erred in this purported contrast. The civil standard for negligence does *not* preclude actual knowledge of the risk of harm to another posed by the actor's conduct. It merely precludes his exoneration based upon a lack of actual knowledge so long as a reasonable man in the same or similar circumstances would have realized the risk.[4]

Some insight, or application, may be provided by the Model Penal Code after which our act was patterned. In defining "reckless" Section 2.02(2)(c) states:

"The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."

American Law Institute, Model Penal Code (Official Draft 1962).

At least it is clear from the commission's comments that they did not intend to impose criminal responsibility for merely negligent conduct. The crucial element is the *quality* of the actor's conduct, i.e., that it be reckless. This poses an additional problem for the courtroom in the context of the present situation for we are concerned not with action but inaction. How does one establish beyond reasonable doubt the *quality* of a defendant's failure or omission to act?[5]

As the final prelude to considering the facts at hand we must consider the specific statute under which the Slushers were prosecuted. Prior to enactment of the new criminal code Indiana did not have a general reckless homicide offense. The motor vehicle act, however, established an offense of reckless homicide. IC 9–4–1–54 (amended 1978). Under that provision:

"Any person who drives a vehicle with reckless disregard for the safety of others and thereby causes the death of another person shall be guilty of the offense of reckless homicide."

In contrast to the language of that act, the present statute, IC 35–42–1–5, directly states:

"A person who recklessly kills another human being commits reckless homicide, a Class C felony."

"Kills" is a transitive verb requiring an object. It normally denotes action. This statute is therefore of no aid in defining the quality of an omission necessary to criminal punishment.

It appears to us that the general requirement of "voluntariness" and the "conscious" and "substantial deviation" requirements of recklessness were intended to implement the commission's *express intention* to avoid criminalizing negligence.

In considering such problems, our courts have long held that a statute which forbids

---

4. In addition, cases decided prior to the code have employed the "knew or should have known" test for criminal recklessness under the motor vehicle statutes. *See, e.g., Hardesty v. State* (1967), 249 Ind. 518, 231 N.E.2d 510; *Shorter v. State* (1954), 234 Ind. 1, 122 N.E.2d 847.

5. We do not suggest it cannot be done, merely that the law requires that it be proved beyond a reasonable doubt.

the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the due process requirements of the fourteenth amendment. *Grayned v. City of Rockford* (1972), 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222; *Baggett v. Bullitt* (1964), 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377; *Sumpter v. State* (1974), 261 Ind. 471, 306 N.E.2d 95; *Grody v. State* (1972), 257 Ind. 651, 278 N.E.2d 280; *Griffin v. State* (1976), 171 Ind.App. 543, 357 N.E.2d 917 (transfer denied). In addition, as the court pointed out in *Wallman v. State* (1981), Ind.App., 419 N.E.2d 1346 (rehearing denied), even a statute which is plain and unambiguous on its face may violate due process when it is applied to a specific situation. *See also United States v. Spector* (1952), 343 U.S. 169, 72 S.Ct. 591, 96 L.Ed. 863.

In *Grayned v. City of Rockford* (1972), 408 U.S. 104, 108–9, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222, quoted by Judge Ratliff in *Wallman*, the Supreme Court explained the two general reasons for the rule:

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application."

As we have already noted, the rear stairs and landings of this apartment building were in an observable state of disrepair and both tenants and governmental inspectors had warned the Slushers and/or complained about their state. On the other hand the record is equally clear that (1) no one ever specifically complained about the porch railing, (2) while the inspector had the power and authority to condemn the porches and stairs as unsafe, he did not do so until after Ms. Olsen's death, and (3) despite her knowledge and complaints about the porch and stairs the tenant, Ms. Novick, did nothing to prevent use of the porch or to warn her guests that it was in any manner unsafe or dangerous.

■ In order to sustain the conviction we must find first that killing a person includes an omission to act which causally results in death. We must then find the conduct was voluntary. Having passed these requirements we must determine that the conduct of omission was reckless and not merely negligent. The statutory mandate for accomplishing that purpose is the determination that the Slushers' failure to act was *both* a *conscious* disregard of the harm that might result and that the disregard involved a *substantial* deviation from "acceptable standards" of conduct.

■ We believe that, at least under the facts and circumstances of this case, reasonable men would necessarily guess at the meaning of that standard as it applies to omissions to act, and that they would differ as to its application. It follows that the convictions should not be permitted to stand as they were had in contravention of the defendants' guarantees to due process of law.

The convictions are therefore reversed.

HOFFMAN, P. J., concurs.

STATON, J., dissents and files separate opinion.

STATON, Judge, dissenting.

I dissent. The convictions should be affirmed.

The majority of this Court has taken a challenge to the sufficiency of the evidence sustaining the Slushers' convictions for

reckless homicide and turned it into an analysis of what "reasonable men" think of the following words:

"A person who recklessly kills another human being commits reckless homicide, a Class C felony." IC 1976, 35–42–1–5 (Burns Code Ed., 1979 Repl.) (amended 1980).

The majority's analytical approach leads it to conclude that the language of IC 35–42–1–5 is unconstitutionally "vague" thereby depriving the Slushers of their federally secured right to due process of law. Predicating its decision on constitutional grounds only, the majority has not decided the merits of the Slushers' challenge to the sufficiency of the evidence sustaining their convictions. The void for vagueness argument was neither raised at trial nor raised in the Slushers' appellate brief.

Underlying the majority's constitutionally-predicated decision is a cacophonic discourse about "criminalizing negligence." The majority goes to great lengths to express its grave consternation for "this kind of prosecution." Reflective of its consternation is the following observation:

"We are concerned that our citizens not be subjected to prosecution and conviction of a felony offense, most especially for a homicide, for conduct which is merely *negligent*." (Emphasis original.)

To assuage its concern for the citizenry, the majority has grasped the void for vagueness doctrine of constitutional law and used it to conclude that the Slushers' convictions for reckless homicide cannot stand. Unfortunately, the majority, in its zeal to divine what is good for "our citizens," has cast aside the criminal statutes enacted by the Indiana Legislature and has ignored the factual determinations of a Lake County jury.

The Slushers were charged with and convicted of committing the reckless homicide of Laureen Olsen, who died after falling from a stairway attached to the back of an apartment building owned and managed by the Slushers. The reckless homicide statute, IC 35–42–1–5, under which the Slushers were convicted provides in pertinent part:

"A person who recklessly kills another human being commits reckless homicide, a class C felony...."

The term "recklessly," as it is used in IC 35–42–1–5, is defined in IC 1976, 35–41–2–2(c) (Burns Code Ed., 1979 Repl.), as follows:

"A person engages in conduct 'recklessly' if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct."

The State prosecuted the Slushers under the theory that they recklessly killed Olsen by permitting the stairway from which Olsen fell to deteriorate to a degree that constituted a hazard to human life. In plain, conscious, and unjustifiable disregard of the harm that might have resulted from the dangerous condition, the Slushers repeatedly refused to repair and maintain the stairway in accordance with acceptable standards. As a result of the Slushers' failure to repair and maintain the stairway, Olsen fell to her death when a railing attached to the third floor porch of the stairway collapsed.

The State sought to impose criminal liability upon the Slushers for their omission to perform an act, i.e., the act of repairing and maintaining the stairway. To support its theory of prosecution, the State relied upon IC 1976, 35–41–2–1(a) (Burns Code Ed., 1979 Repl.), which provides:

"A person commits an offense only if he voluntarily engages in conduct in violation of the statute defining the offense. However, a person who omits to perform an act commits an offense only if he has a statutory, common law, or contractual duty to perform the act."

The State asserted that the Slushers' omission constituted a breach of a common law duty imposed upon a landlord to maintain the common entryways of an apartment building over which the landlord retains control in a safe condition. The Slushers' failure to perform the act required by that common law duty, the State concluded, re-

sulted in the reckless homicide of Olsen. The jury agreed with the State, and the trial court sentenced Frank Slusher to five years' imprisonment and Marietta Slusher to three years' imprisonment.

On appeal, the Slushers deny having owed Olsen a statutory, common law, or contractual duty to maintain the stairway in a safe condition because she was at the time of her fall merely a social guest of a tenant who the Slushers have classified as a "tenant at sufferance." As the Slushers state their argument, "If they owed the decedent no such duty, then no crime could have been committed." An evaluation of the merit of the Slushers' argument requires a recital of the evidence adduced at trial.

The record reveals that on the evening of May 7, 1979, Laureen Olsen, Stella Novick, Anthony Salimoni, Michael Montano, and Novick's four children gathered in Novick's apartment to celebrate Olsen's 21st birthday. After dinner, Olsen, Novick, and the others congregated on the back porch of Novick's third floor apartment to get some fresh air. The porch was part of an outdoor stairway to which Novick and other tenants in the apartment building had access. While standing on the porch, Olsen, who was 5'6" and weighed approximately one hundred pounds, placed her hands on the porch railing. The railing collapsed, and Olsen plunged three stories onto a concrete slab located behind the apartment building. Olsen sustained a skull fracture and other injuries from the fall. One week after her fall, Olsen died from those injuries and resultant complications.

Novick rented the apartment on January 3, 1979, from the Slushers, who owned and managed the multi-unit apartment building located at 6007–6009 Hohman Avenue in Hammond, Indiana. The Slushers fixed Novick's rent at $250.00 per month. Soon after moving into the apartment, Novick complained to the Slushers about the condition of the back stairway. In April of 1979,

Novick's son fell through a hole in one of the stairway landings, but he was not injured seriously. Novick informed the Slushers of the incident, and Frank Slusher responded by placing a piece of plywood over the hole. The plywood was neither nailed nor glued to the stairway but remained loose over the hole. Novick filed other complaints with the Slushers regarding various defects in the apartment, such as the absence of heat during February and March, inoperative bathroom facilities, and a light switch in her children's room that emitted smoke when used. None of these defects were repaired by the Slushers, so Novick discontinued paying rent.

The Slushers received other complaints about the condition of the back stairway before Olsen's fall. Four former tenants of the apartment building testified that they lodged complaints with the Slushers about numerous defects in the apartment building, including the condition of the stairway. The former tenants described the stairway as "extremely hazardous," having "weak spots," and being in "bad condition." One former tenant stated that the stairway began to deteriorate in 1976, one year after the Slushers purchased the apartment building. The former tenants related several "close calls" they had while trying to negotiate the stairway. One former tenant invited his employer, who owned and managed apartment buildings, to examine the condition of the tenant's apartment. While the employer was descending the back stairway, his foot went through one of the stairway landings. In response to the tenants' complaints, the Slushers promised to erect a steel stairway, but that promise remained unfulfilled for a long time.[1]

The Slushers also received complaints about the condition of the apartment building and its stairway from various municipal agencies. Some agency complaints were made as far back as 1976 and involved defects in the stairway. The building commissioner of the City of Hammond sent the

1. The transcript of the sentencing hearing reveals that the Slushers began the erection of a steel stairway approximately two weeks before their sentencing, which occurred on September 4, 1980.

Slushers a letter dated November 3, 1976 (State's Exhibit No. 18) that stated:

"Complaints have come into this office regarding the large hole in the rear porch landing of your apartment at 6009 Hohman Avenue, Hammond.

"Kindly make repairs immediately and any further information you may wish, please contact this office."

On January 19, 1979, representatives from the health department, fire prevention bureau, and building commission of the City of Hammond conducted a joint inspection of the Slushers' apartment building in response to several complaints from its tenants. William Burgess, the building commissioner, inspected the stairway behind Novick's apartment and concluded that the stairway was "completely unsafe." Burgess predicated his conclusion upon the absence of several railings and the extensive rotting of the wood. The Slushers were sent a registered letter dated January 24, 1979 (State's Exhibit No. 19), from Burgess informing them that they had thirty days to repair the defective stairway. The letter stated, *inter alia*:

"Your property at the above captioned address was inspected on January 19, 1979, at which time Mr. George Stahura, Health Department, Captain Leo Sartoris, Fire Inspection, and I noted the following conditions:

"1. The rear stairs and landings are hazardous to life and limb due to substandard conditions...."

In response to the letter, the Slushers assured Burgess that they would raze the old stairway and erect a steel stairway in its place. However, on May 21, 1979, which was two weeks after Olsen's fall, Burgess conducted another inspection of the apartment building and found the stairway to be in the same state of disrepair in which it had been on January 19, 1979. Finally, on April 16, 1980, Burgess sent a notice of condemnation to the Slushers. The notice (State's Exhibit No. 1) informed the Slushers that the stairway was condemned and that the apartment building was to be vacated until the stairway was replaced. As

noted previously, the Slushers erected a steel stairway in September of 1980.

The police officers who investigated the scene of Olsen's fall described the stairway as "bad, rickety, unlighted," "shaky," and in a "very rotten condition." The upper and lower railings of the third floor porch from which Olsen fell were collected by the investigating officers and subjected to laboratory analysis. A chemist and physical examiner from the Northwest Indiana Criminal Toxicology Laboratory conducted a microscopic examination of particles taken from the railings and determined that they were of a "flaky consistency" and were "partly rotted." The railings were admitted as evidence (State Exhibits Nos. 29A and 29B).

Sam Spitale, a carpenter who qualified as an expert in the field of carpentry due to his extensive experience in building and in teaching how to build wooden stairways, made an in-court examination of the railings and concluded that they were "rotted at the ends where the main supports are." Spitale testified that the railings were composed of redwood, which would have required a long period of neglect to evolve into a rotten condition. He concluded that it would not have taken much stress to have caused the railings to collapse "[b]ecause there's absolutely no holding power in the nails, and the board is so rotted that it fell off the board as it came down."

On appeal, the Slushers have not challenged the sufficiency of the evidence adduced at trial to establish that the third floor railings of the stairway porch were in a defective condition. Nor have the Slushers disputed the fact that they had ample notice of the defective condition of the stairway. Rather, the Slushers contend that they owed no common law duty to Olsen to maintain the stairway in a safe condition, and that the existence of a common law duty is a prerequisite to the imposition of criminal liability under IC 35–41–2–1(a) for the omission to perform an act. Whether the Slushers owed Olsen a duty to maintain the premises in a safe condition is a matter that must be resolved by exam-

ining the basic tenets of Indiana landlord-tenant law.

In the absence of statute, covenant, fraud, or concealment, a landlord who gives a tenant full control and possession of the leased property will not be liable for personal injuries sustained by the tenant and other persons lawfully upon the leased property, even if those injuries are caused by a defect in the condition of the leased property. *Great Atlantic & Pacific Tea Co., Inc. v. Wilson* (1980), Ind.App., 408 N.E.2d 144, 147; *Hunter v. Cook* (1971), 149 Ind. App. 657, 660–61, 274 N.E.2d 550, 552; *Rene's Restaurant Corp. v. Fro-Du-Co Corp.* (1965), 137 Ind.App. 559, 563, 210 N.E.2d 385, 387. The rationale for immunizing a landlord from liability is that a lease constitutes a conveyance of property that terminates the landlord's control of the property, and tort liability may not be imposed for conditions beyond the landlord's control. Schoshinski, *American Law of Landlord and Tenant* § 4:1, at 186 (1980). However, this ancient rule of *caveat lessee* has been subjected to several exceptions in most jurisdictions, including Indiana. Schoshinski, *supra*, § 4:2, at 188. This Court analyzed one of those exceptions in *Rossow v. Jones* (1980), Ind.App., 404 N.E.2d 12, in which it was held that a landlord has a duty to maintain in a safe condition the common entryways and other parts of an apartment building used in common by tenants over which the landlord has retained control. *Rossow, supra*, 404 N.E.2d at 14; *see also, Tippecanoe Loan & Trust Co. v. Jester* (1913), 180 Ind. 357, 101 N.E. 915; *Coleman v. DeMoss* (1969), 144 Ind.App. 408, 246 N.E.2d 483; *LaPlante v. LaZear* (1903), 31 Ind.App. 433, 68 N.E. 312.

*Rossow* and the other Indiana cases cited above charted a course well within the mainstream of landlord-tenant law throughout the United States. The position taken by the American Law Institute is illustrative of the prevailing rule:

"A landlord who leases a part of his property and retains in his own control any other part the tenant is entitled to use as appurtenant to the part leased to him, is subject to liability to his tenant and others lawfully upon the leased property with the consent of the tenant or a subtenant for physical harm caused by a dangerous condition upon that part of the leased property retained in the landlord's control, if the landlord by the exercise of reasonable care could have:

"(1) discovered the condition and the unreasonable risk involved therein; and

"(2) made the condition safe."

Restatement (Second) of Property (Landlord & Tenant) § 17.3, at 189 (1977); *see also*, Restatement (Second) of Torts § 360, at 250 (1965); Prosser, *Law of Torts* § 63, at 405–08 (4th ed. 1971); 2 Harper & James, *The Law of Torts* § 27:17, at 1516–18 (1956 & 1968 Supp.); 1 Tiffany, *The Law of Real Property* § 109, at 169–73 (3d ed. 1939 & 1981 Supp.); Schoshinski, *supra*, § 4:4, at 190–94 (1980). The rationale for this well-accepted rule was stated succinctly in a leading article on the expansive trend of premises liability in landlord-tenant law:

"The duty to repair premises reserved for common use is placed upon the landlord for both pragmatic and policy reasons. Practically, if it were left to the tenants to repair these areas, they would have difficulty determining whether repairs were needed, and if so, who should make them and how the cost should be allocated. From a policy standpoint, it also makes sense to place the responsibility on the landlord, since he is more apt to have both the incentive and the financial ability to make repairs. Moreover, this is consistent with legal precedent: since the landlord is in control of these areas, he is the one who should be held liable in tort for any personal injuries or property damage caused by a defect in the premises." (footnotes omitted)

Love, "Landlord's Liability for Defective premises: Caveat Lessee, Negligence, or Strict Liability?," 75 *Wis.L.Rev.* 19, 66–67 (1975).

A landlord's duty to maintain common areas in a safe condition extends to business visitors and social guests of a tenant, for

the duties and liabilities of a landlord to business visitors and social guests of a tenant are the same as those which the landlord owes to the tenant. *Town of Kirklin v. Everman* (1940), 217 Ind. 683, 689, 28 N.E.2d 73, 75, *modified on other grounds,* 217 Ind. 692, 29 N.E.2d 206. Professor Prosser observed that the duty to maintain common areas retained under the landlord's control in a safe condition "extends also to members of the tenant's family, his employees, his invitees, his guests, and others on the land in the right of the tenant, since their presence is a part of the normal use of the premises for which the lessor holds them open." (footnotes omitted) Prosser, *supra,* § 63, at 406. The justification for extending the landlord's duty to third persons lawfully upon the leased property was stated persuasively by the American Law Institute:

"If the terms of the lease entitle the lessee to permit third persons to come upon the part of the land retained within the lessor's control, it is immaterial whether they come as invitees of the lessee or as his licensees. It is the lessor's business, as such, to afford his lessee facilities for receiving all persons whom he chooses to admit for any legitimate purpose. Therefore, a person who, as between himself and the lessee, is a licensee enters the land on a matter directly connected with the business of the lessor. He is, therefore, entitled to expect that the lessor will exercise reasonable care to discover and remedy any condition which makes his acceptance of the lessee's license dangerous to him."

Restatement (Second) of Torts § 360, comment *f.,* at 253 (1965).

While not stating so in their appellate brief, the Slushers appear to be conceding that a landlord owes a social guest of a tenant the duty to maintain common areas in a safe condition. However, the Slushers contend that on the day of Olsen's fall, Novick was a "tenant at sufferance" in the apartment building and that Olsen and she were not entitled to all of the rights normally afforded to a *bona fide* tenant. The Slushers analogize Olsen's legal status on the day of her fall to that of a "licensee" on the property owned by another person. As such, Novick's status as a tenant at sufferance and Olsen's status as a licensee operated to deprive Olsen of the landlord's duty to maintain common areas in a safe condition. An understanding of the Slushers' argument requires a recitation of the facts on which the Slushers rely.

On January 3, 1979, the Slushers rented the apartment to Novick for $250.00 per month. The intended duration of the term of the lease does not appear to have been specified. Sometime before March 21, 1979, Novick discontinued paying rent because she believed the defective stairway, the absence of heat during February and March, the inoperative bathroom facilities, the faulty electrical switch, and other defects rendered the apartment uninhabitable. On March 21 and 22, 1979, the Slushers, in Mrs. Slusher's name, instituted ejectment proceedings in the Lake County Court against Novick and other tenants, who also refused to pay rent in light of the Slushers' failure to repair numerous defects that existed in the apartment building. On May 1, 1979, the court hearing the ejectment action against Novick made the following order book entry:

"The court finds that the plaintiff is entitled to the immediate possession of said premises. The defendant agrees to voluntarily vacate said premises on May 5, 1979. The court further grants leave to the plaintiff to file an amended Notice of Claim for damages, if she so chooses. The court therefore continues the hearing on plaintiff's claim for damages. IT IS THEREFORE CONSIDERED, ADJUDGED AND DECREED by the court that the plaintiff have immediate possession of the premises at 6007 Hohman Avenue, Hammond, Indiana, but the court stays issuance of an order of ejectment pending the defendant voluntarily vacating said premises on May 5, 1979. . . ."

The hearing on the Slushers' claim for unpaid rent was continued, and on May 29, 1979, the court entered a $500.00 judgment

in favor of the Slushers for Novick's unpaid rent.

The day before Novick was to have vacated her apartment in accordance with the voluntary agreement, Novick discovered that the apartment into which she was to have moved was not going to be available. The tenant of that apartment decided against moving to Texas and intended to remain in the apartment reserved for Novick. Novick, after informing Mrs. Slusher that she could not vacate the apartment by May 5th, asked to remain in the apartment temporarily until she and her children could find another place to live. Mrs. Slusher responded, "Just find another place and get out by the end of the month." Two days after Mrs. Slusher gave Novick permission to remain in the apartment until the end of May, Olsen fell from the third floor porch.

On May 10, 1979, three days after Olsen's fall, the Slushers appeared before the Lake County Court again and advised it that Novick had not vacated the apartment in accordance with the agreement to vacate by May 5th. Novick did not appear at the hearing. The court immediately issued an ejectment order. Sometime after the issuance of the ejectment order, a deputy of the Lake County Sheriff's Department evicted Novick and her children from the Slushers' apartment building.

Based on these facts, the Slushers contend that Novick was a tenant at sufferance on the day of Olsen's fall and that Indiana landlord-tenant law would treat a tenant at sufferance and her social guests as licensees, to whom, under Indiana property law, a landowner owes no duty to maintain the property in a safe condition. A brief survey of applicable law will facilitate an evaluation of the Slushers' argument.

A tenancy at sufferance arises when a person comes into possession of property lawfully but occupies it after the termination of that person's interest. *Coomler v. Hefner* (1882), 86 Ind. 108, 110–11. The creation of a tenancy at sufferance need not be preceeded by the existence of a valid lease between the possessor and the owner of the property. *Jump v. Pilgrim Properties* (1947), 118 Ind.App. 164, 167, 75 N.E.2d 165, 166. When a valid lease has been in existence, a tenancy at sufferance arises only when the tenant, who at one time lawfully possessed the leased property, continues in possession after the tenant's right to possession has been terminated. *Coomler, supra,* 86 Ind. at 110–11. After the termination of the tenant's right to possession, the tenant who retains possession of the leased property with the express or implied consent of the landlord is not a tenant at sufferance. *Coomler, supra,* 86 Ind. at 111.[2]

A licensee is a person who enters the property of another for his own convenience, curiosity, or entertainment. *Barbre v. Indianapolis Water Co.* (1980), Ind.App., 400 N.E.2d 1142, 1146; *Mullins v. Easton* (1978), Ind.App., 376 N.E.2d 1178, 1181; *Fort Wayne National Bank v. Doctor* (1971), 149 Ind.App. 365, 370, 272 N.E.2d 876, 880. A licensee is to be distinguished from an invitee, who enters the property of another at the express or implied invitation of the landowner (or occupier) either to transact business with the landowner or to act for the mutual commercial advantage of the landowner and the invitee. *Great Atlantic & Pacific Tea Co., Inc. v. Wilson, supra,* 408 N.E.2d at 147; *Barbre, supra,* 400 N.E.2d at 1146; *Mullins, supra,* 376 N.E.2d at 1181. The legal classification of a person entering the property of another is of paramount importance in Indiana since the legal status of that person determines the extent of the duty of care the landown-

---

2. A recent case indicates that a person, after entering and possessing property as a prospective purchaser rather than as a tenant to a preexisting lease, will be deemed to be a tenant at sufferance if possession is retained with the permission of the landowner but without an agreement for rent. *Wallace v. Rogier* (1979), Ind.App., 395 N.E.2d 297, 299. *Wallace* does not appear to contravene the Supreme Court's holding in *Coomler* that the *consensual* possession of formerly leased property by the tenant prevents a tenancy at sufferance from arising.

er owes to that person.[3] A landowner owes a duty to an invitee to maintain the property in a reasonably safe condition. *Hammond v. Allegretti* (1974), 262 Ind. 82, 86–87, 311 N.E.2d 821, 824–25; *Great Atlantic & Pacific Tea Co., Inc. v. Wilson, supra,* 408 N.E.2d at 146–47; *Mullins, supra,* 376 N.E.2d at 1181. The duty owed by a landowner to a licensee differs extensively from that owed to an invitee. The landowner owes no duty to a licensee to maintain the property in a safe condition, and the landowner incurs no liability for personal injuries sustained by a licensee as a result of a defect in the property. *Barbre, supra,* 400 N.E.2d at 1146; *Xaver v. Blazak* (1979), Ind.App., 391 N.E.2d 653, 655; *Mullins, supra,* 376 N.E.2d at 1181; *Fort Wayne National Bank v. Doctor, supra,* 149 Ind.App. at 371, 272 N.E.2d at 880. A presumption exists that a licensee will recognize and avoid a dangerous condition on the landowner's property, and the licensee must take the property subject to its concomitant perils. *Swanson v. Shroat* (1976), 169 Ind. App. 80, 87–88, 345 N.E.2d 872, 876–77. However, the presumption does not operate to absolve the landowner of all liability for personal injuries sustained by a licensee upon the property. In *Fort Wayne National Bank v. Doctor, supra,* Judge Buchanan attempted to disentangle what he characterized as a "snarled" area of property law by setting forth three tests under which a

landowner may be held liable for personal injuries sustained by a licensee:

"(1) the positive act test, as applied in *Woodruff, Administratrix v. Bowen, supra,* [136 Ind. 431] 34 N.E. 1113;

"(2) the wilful or wanton misconduct test, set forth in *Lingenfelter v. Baltimore, etc., R. Co.* (1900), 154 Ind. 49, 55 N.E. 1021; and

"(3) the entrapment-affirmative control of the instrument test, arising from language in *Pier v. Schultz* (1962), 243 Ind. 200, 182 N.E.2d 255."

*Fort Wayne National Bank v. Doctor, supra,* 149 Ind.App. at 374–75, 272 N.E.2d at 882; *see also, Xaver, supra,* 391 N.E.2d at 655; *Surratt v. Petrol, Inc.* (1974), 160 Ind. App. 498, 499, 316 N.E.2d 453, 454 (on petition for rehearing from 160 Ind.App. 479, 312 N.E.2d 487). These three tests arose from the recognition that the basic presumption that a licensee will perceive and avoid an existing dangerous condition fails when a licensee "is either unable to recognize or unable to avoid danger." *Swanson, supra,* 169 Ind.App. at 88, 345 N.E.2d at 877. A licensee will not be required to anticipate and guard against hidden defects or dangers or conduct by the landowner that is "so grossly deviant from everyday standards that it places the licensee in an unusually dangerous position." *Id.*

**3.** Indiana has not joined the wave of jurisdictions that have abolished the common law distinction between invitee and licensee in determining the extent of the landowner's duty. Beginning with the landmark case of *Rowland v. Christian* (1968), 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496, courts throughout the United States have imposed upon a landowner the duty to exercise reasonable care in maintaining the property when the presence of other persons is known or should have been known by the landowner, regardless of their legal status on the property. These courts have reasoned that the landowner's knowledge of the probability of harm to other persons on the property should supercede the technical classification of the entrants in determining the extent of the landowner's duty of care owed to the entrants.

The United States Supreme Court has observed that the invitee-licensee distinctions "were inherited from a culture deeply rooted to the

land, a culture which traced many of its standards to a heritage of feudalism." *Kermarec v. Compagnie Generale Transatlantique* (1959), 358 U.S. 625, 630, 79 S.Ct. 406, 410, 3 L.Ed.2d 550, 554. Some state courts have not been as kind to the invitee-licensee distinctions as was the United States Supreme Court. A Massachusetts court stated that the policy of treating invitees and licensees differently is an "ancient and largely discredited common law distinction which favors the free use of property without due regard to personal safety of those individuals who have heretofore been classified as licensees." *Mounsey v. Ellard* (1973), 363 Mass. 693, 706–07, 297 N.E.2d 43, 51. A Missouri court called the invitee-licensee distinctions "vestigial remnants of the historical past which bear little rational relationship to the complex, personal and economic relationships of modern age." *Heald v. Cox* (Mo.App.1972), 480 S.W.2d 107, 109.

It is before this legal backdrop that the Slushers contend that Novick was a tenant at sufferance and Olsen was merely a licensee to whom the Slushers owed no duty to maintain the stairway in a safe condition. The Slushers argue that a tenancy at sufferance arose when the ejectment proceedings they filed against Novick resulted in a finding that they were entitled to possession of the apartment, and once that tenancy arose, Novick and her social guest, Olsen, became licensees. The State disputes the Slushers' basic premise that Novick became a tenant at sufferance because Novick possessed the apartment on May 7, 1979, with the express consent of the Slushers.

The majority of this Court has concluded that the Slushers owed Novick and her social guests a duty to maintain the common stairway in a safe condition. The majority opinion states that "we have no doubt that under the facts, a duty to make the premises reasonably safe was indeed owed by the landlords." On this point, I am in complete agreement with the Majority. Novick was in the apartment on the day of Olsen's fall with the express consent of Mrs. Slusher, who told Novick on or about May 5, 1979, to vacate the apartment by the end of the month. Furthermore, the Slushers fully intended (and did so by recovering a $500.00 judgment against Novick for unpaid rent) to recover rent for Novick's use of the apartment since she had discontinued paying rent. Damages were assessed well after Novick had vacated the apartment. While the Lake County Court determined on May 1, 1979, that the Slushers were entitled to possession of the apartment, the court refrained from issuing an ejectment order in light of the parties' voluntary agreement to permit Novick to remain in the apartment until May 5, 1979. Mrs. Slusher later extended that period until the end of May. As was stated in *Coomler, supra*, a tenancy at sufferance cannot arise when a tenant under a preexisting lease retains possession of the leased property with the express or implied consent of the landlord. The evidence clearly reveals that Novick's presence on the Slushers' property on May 7, 1979, was a consensual presence for which the Slushers later sought remuneration by court order.

Assuming *arguendo* that Novick was a tenant at sufferance on the day of Olsen's fall, the Slushers have cited no authority that indicates that a tenant at sufferance should be treated as a licensee. A line of cases from Massachusetts sheds light on the Slushers' assertion. In *Galjaard v. Day* (1950), 325 Mass. 475, 91 N.E.2d 345, a tenant sustained personal injuries after the landlord had obtained a judgment for possession of the leased property but before the trial court had issued an order for the execution of the judgment. On appeal, the Supreme Judicial Court, quoting from *Margosian v. Markarian* (1934), 288 Mass. 197, 199, 192 N.E. 612, 613, held that the tenant under such circumstances was a tenant at sufferance and that a "tenant at sufferance is a bare licensee to whom the landlord owes merely the duty not wantonly nor wilfully to injure him." *Galjaard, supra*, 325 Mass. at 476, 91 N.E.2d at 345. In the recent case of *King v. G & M Realty Corp.* (1977), 373 Mass. 658, 370 N.E.2d 413, the Supreme Judicial Court, while not overruling *Margosian* expressly, noted that the effect of recent state legislation, which made a tenant at sufferance liable for rent, may have given a tenant at sufferance "a more honorific status" than a "bare licensee." *King, supra*, 373 Mass. at 664, 370 N.E.2d at 417. The import of the *King* decision is that a landlord now receives a pecuniary benefit from the presence of a tenant at sufferance on the property, and as such, that tenant must have the rights and liabilities normally afforded to an invitee. Included in these rights would be the right to having common areas of the apartment building maintained in a safe condition. I find persuasive the belief that the possibility of a pecuniary benefit for the landlord is enough to elevate a tenant at sufferance from a "bare licensee" to an invitee who is entitled to have common areas maintained in a safe condition.

The application of Indiana law to the facts of the present case supports the State's position that the Slushers owed Ol-

sen a common law duty to maintain the stairway in a safe condition and that the Slushers breached that duty. The evidence adduced at trial established overwhelmingly that

(1) the back stairway attached to the multi-unit apartment building was a common area over which the Slushers retained control;

(2) the back stairway was an area that Novick and her social guests were entitled to use as appurtenant to the leased property;

(3) Olsen was lawfully within the area with Novick's consent; and

(4) a dangerous condition posing an unreasonable risk existed in the area, and the Slushers, after discovering the existence of the condition, failed to exercise reasonable care to make the area safe.

The jury found that the breach of the Slushers' common law duty to maintain the stairway in a safe condition was done in a reckless manner. The Slushers have not challenged the sufficiency of the evidence supporting the element of recklessness, but the record nevertheless sustains the factual conclusion that the Slushers failed to perform the act "in plain, conscious, and unjustifiable disregard of harm that might [have] result[ed] and the disregard involve[d] a substantial deviation from acceptable standards of conduct."[4] IC 35–

---

[4] It is arguable that one who engages in reckless conduct within the statutory definition of reckless homicide also engages in "wilful and wanton" misconduct. As noted earlier in this dissenting opinion, a landowner is liable to a licensee for personal injuries caused by the landowner's "wilful and wanton" misconduct. *See, Fort Wayne National Bank v. Doctor, supra*, 149 Ind.App. at 374–75, 272 N.E.2d at 882. The concept of "wilful and wanton" misconduct as understood in Indiana civil law appears to encompass the Slushers' failure to perform the common law duty they owed to Olsen. This Court stated:

"'"The rule as to what is necessary to show 'willful or wanton' misconduct is succinctly stated in Bedwell v. DeBolt, *supra*, 1943, 221 Ind. 600, at page 607, 50 N.E.2d 875, at page 878, as follows:

"'"'To hold one guilty of "wilful" or "wanton" conduct, it must be shown that he was conscious of his conduct and with knowledge of existing conditions that injury could probably result, and with reckless indifference to consequences, he consciously and intentionally did some wrongful act *or omitted some duty* which produced the injuries.' * * *"'

"See also: *Brueckner v. Jones* (1970), Ind. App., 255 N.E.2d 535, 20 Ind.Dec. 315 (transfer denied); *Schwing v. McKibbin* (1970), Ind.App., 264 N.E.2d 629, 24 Ind.Dec. 35 (transfer denied); *Mazza v. Kelly* (1970), Ind. App., 258 N.E.2d 171, 21 Ind.Dec. 313."'" (emphasis added)

*McClure v. Austin* (1972), 152 Ind.App. 398, 403, 283 N.E.2d 783, 785–86. Other cases demonstrate that wilful and wanton misconduct may consist of "conscious and intentional ... omission of a duty with reckless indifference to the consequences ...." *See, Kirsch v. Harker* (1950), 120 Ind.App. 66, 71, 89 N.E.2d 924, 926; *Swinney v. Roler* (1943), 113 Ind.App. 367, 371,

47 N.E.2d 846, 847. Assuming *arguendo* that Olsen was entitled only to the rights normally afforded to a licensee, the Slushers would have nevertheless breached the duty they owed to Olsen to have refrained from wilfully and wantonly injuring her. The definition of "wilful and wanton" misconduct discussed above would therefore include the Slushers' egregious omission to maintain the stairway in a safe condition as required by Indiana common law. Cases from other jurisdictions clearly support the proposition that an omission to perform an act required by a legal duty may constitute wilful and wanton misconduct. *Washington v. Trend Mills, Inc.* (1970), 121 Ga.App. 659, 660, 175 S.E.2d 111, 113; *Sprague v. Commonwealth Edison Co.* (1978), 59 Ill.App.3d 342, 346–47 [16 Ill.Dec. 620, 625], 375 N.E.2d 493, 498; *Hessler v. Cole* (1972), 7 Ill.App.3d 902, 906, 289 N.E.2d 204, 206; *Commonwealth v. Godin* (1977), 374 Mass. 120, 129, 371 N.E.2d 438, 444, *cert. denied* (1978), 436 U.S. 917 [98 S.Ct. 2263, 56 L.Ed.2d 758]; *Summerville v. Board of County Road Commissioners of County of Kalamazoo* (1977), 77 Mich.App. 580, 586–87, 259 N.W.2d 206, 210. *Washington, supra*, and *Hessler, supra*, specifically held that landowners could be held liable for deliberate omissions in dealing with licensees. While it appears that the Slushers' wilful and wanton misconduct provides an alternate basis for affirming their convictions, this Court does not rely upon this basis in resolving their appeal. This Court has stated that the three exceptions to a landowner's immunity for injuries to licensees require the landowner to engage in "active, affirmative, or positive" conduct before liability may be imposed upon the landowner. *Xaver, supra*, 391 N.E.2d at 655; *Surrat, supra*, 160 Ind.App. at 501, 316 N.E.2d at 455. A landowner's omission to perform an act in accordance with a legal duty may be considered as passive conduct for which liability may not

41–2–2(c). The Slushers' sole contention on appeal was that they owed Olsen no legal duty. This particular contention has been rejected by the majority of this Court. It is on other grounds that the majority of this Court refuses to affirm the Slushers' convictions.

The imposition of criminal liability upon a landlord for a death caused by the defective condition of an apartment building appears to be an extraordinary remedy for the State to pursue. Ostensibly, landlord-tenant relations have been under the regulatory domain of civil law.[5] Moreover, a landlord's passive conduct that results in a tenant's death or serious bodily injury may not necessarily command the public indignation and outrage that arises over traditional *malum in se* crimes, such as murder, rape, and robbery. These two facts should not preclude the State from invoking the criminal code when the situation warrants criminal prosecution. Having enacted IC 35–41–2–1(a), the legislature has created a statutory framework which permits the use of criminal sanctions when a person's reckless failure to perform an act calls for moral con-

demnation by the community. A reckless homicide conviction under IC 35–42–1–5 and IC 35–41–2–1(a) is proper when

(1) the defendant owed the decedent a statutory, common law, or contractual duty to perform an act;

(2) the defendant failed to perform that act;

(3) the other person's death resulted from the nonperformance of that act; and

(4) the defendant failed to perform the act in plain, conscious, and unjustifiable disregard of the harm that might have resulted and the disregard involved a substantial deviation from acceptable standards of conduct.

No cases have been found that impose criminal liability for a landlord's breach of the common law duty to maintain a common area of an apartment building in a safe condition, but the imposition of criminal liability for an omission to act is no stranger to criminal law. An affirmative duty to act may bear with it criminal responsibility for the nonperformance of that act. Supporting his discussion of criminal liabili-

be imposed. However, Indiana has abandoned the active-passive distinction in negligence law in determining a tortfeasor's liability. *See, Mansfield v. Shippers Dispatch, Inc.* (1980), Ind.App., 399 N.E.2d 423, 425; *Fort Wayne National Bank v. Doctor, supra*, 149 Ind.App. at 374, 272 N.E.2d at 882. Thus, the "wilful and wanton" misconduct test may need to be expanded to embrace omissions such as the one presented in this case, particularly in light of the overruling of those cases which held that a landowner must refrain from engaging in "active negligence" against a licensee. *See*, cases overruled in *Fort Wayne National Bank v. Doctor, supra*, 149 Ind.App. at 374, 272 N.E.2d at 882.

**5.** The social ill of dilapidated urban housing has been combatted with various civil remedies created by the judiciary and legislatures. In many jurisdictions, the general rule of *caveat lessee*, with its few exceptions such as the one discussed in *Rossow, supra*, has been abrogated in favor of a rule requiring rental property to be maintained in a safe condition by the landlord. Some courts, such as *Javins v. First National Realty Corp.* (1970), 138 U.S.App.D.C. 369, 428 F.2d 1071, *cert. denied*, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185, and Indiana's *Old Town Development Co. v. Langford* (1976), Ind. App., 349 N.E.2d 744, *appeal dsmd.* (1977), 267

Ind. 176, 369 N.E.2d 404 (Court of Appeals' opinion vacated after parties negotiated a settlement agreement while transfer was pending before the Indiana Supreme Court), have created a contractual duty to maintain rental property in a safe condition by finding an implied warranty of habitability in residential leases. One court has gone as far as applying ordinary tort principles to leases by holding that in all circumstances, a landlord must exercise reasonable care in not subjecting a tenant and other persons whose presence is foreseeable to an unreasonable risk of harm. *Sargent v. Ross* (1973), 113 N.H. 388, 308 A.2d 528, 64 A.L.R.2d 329.

Some jurisdictions have relied upon legislative enactments to further the goal of safe housing. Comprehensive municipal housing codes usually dominate this area of legislation, although some states have enacted state-wide legislative controls of rental property. *See*, Ohio Rev. Code Ann. § 5321.04 (1981). These legislative enactments are now being extended to provide criminal sanctions as well as civil sanctions for housing violations. *See*, Ill.Rev.Stat. ch. 38, § 12–5.1 (1979), and *Comment*, "Criminal Sanctions Against Landlords? The Criminal Housing Management Statute in Illinois," 1980 *So.Ill.U.L.J.* 319 (1980).

ty for "negative acts," Professor Perkins observed:

"Apart from the statutory requirements of positive action, such as the filing of income tax returns (and these are myriad), the common types of required performance which are important in the criminal law are (1) the duty to provide food, clothing and shelter, (2) the duty to provide medical care and attention, and (3) the duty to safeguard certain persons or the general public against special hazards. The types of required performance and the sources of the legal duty to perform are intertwined. Thus the father of a child of tender years has the duty to provide the child with food, clothing and shelter, also, in case of need, to provide him with medical care and attention, and furthermore, to take reasonable steps, in cases of emergency, to safeguard him against special hazards, such as drowning. On the other hand, the duty to supply food, clothing and shelter may arise out of a legal relation, a factual situation, or a contract, or it may be imposed by express provisions of a statute." (Footnotes omitted.)

Perkins, *Criminal Law*, 596–97 (2d ed. 1969). In Indiana, the case of *Eaglen v. State* (1967), 249 Ind. 144, 231 N.E.2d 147, represents an instance in which the involuntary manslaughter conviction of a parent was affirmed where the parent breached the statutory duty to obtain proper medical care for his child, who died from pneumonia caused by malnutrition. *See also, Worthington v. State* (1980), Ind.App., 409 N.E.2d 1261; *Smith v. State* (1980), Ind.App., 408 N.E.2d 614. Neglect of dependent cases are legion throughout the United States.[6] Cases imposing criminal liability for an omission of an act by a landowner or a person entrusted with a task to safeguard the general public are not as plentiful, but they do exist. *See, e.g., Commonwealth v. Godin* (1977), 374 Mass. 120, 371 N.E.2d 438,

*cert. denied* (1978), 436 U.S. 917, 98 S.Ct. 2263, 56 L.Ed.2d 758 (manslaughter conviction against president of fireworks manufacturer who caused deaths of employees by failing to properly store fireworks); *Commonwealth v. Welansky* (1944), 316 Mass. 383, 55 N.E.2d 902 (manslaughter conviction against night club owner who caused deaths of patrons by failing to provide proper fire escapes); *State v. O'Brien* (1867), 32 N.J.L. 169 (manslaughter conviction against railroad switchman for failing to properly tend to railroad switch). In *Welansky, supra,* the Court observed:

"[W]here as in the present case there is a duty of care for the safety of business visitors invited to premises which the defendant controls, wanton or reckless conduct may consist of intentional failure to take such care in disregard of the probable harmful consequences to them or of their right to care." (footnote omitted.)

*Welansky, supra,* 316 Mass. at 397, 55 N.E.2d at 909. Thus, no new trails would be blazed in dealing with the recalcitrant landlords in the present case by holding them accountable for Olsen's death. The State properly invoked IC 35–41–2–1(a) in exacting punishment for the Slushers' egregious and reckless neglect of their apartment building.

The majority apparently disagrees with the jury's factual determination that the Slushers, by plainly, consciously, and unjustifiably disregarding the harm that could result from the condition of their premises, engaged in *reckless* conduct punishable under the Indiana Criminal Code. The majority's reasons for overturning the jury's verdict of guilty are twofold: (1) it views the Slushers' conduct as merely being "negligent," as that concept is known in tort law, and (2) it just does not believe that a landlord can be held criminally responsible for consequences flowing from the condition of the demised premises. The majority's rea-

---

**6.** A recent case from Wisconsin illustrates the fact that the reckless homicide statute may be used in neglect of dependent cases. In February of 1982, Stephen Serebin, an administrator of a Milwaukee nursing home, was found guilty of "homicide by reckless conduct" and sentenced to six years' imprisonment for the death of a 78-year-old patient of the nursing home. The patient wandered out of the nursing home into the bitter Wisconsin cold and was found frozen to death the next morning. *State of Wisconsin v. Stephen Serebin* (1982), N.W.2d, *appeal docketed* No. 82–232–CR (Wisc.Ct.App., 1st Dist.).

soning is specious. The former reason wrests the fact-finding function from the jury, and the latter reason usurps the legislature's prerogative to define by statute that which is criminal conduct.

The majority also appears to disagree with holding a person criminally responsible for inaction. The majority states: " 'kills' is a transitive verb requiring an object. It normally denotes action." Yet, this same Court readily affirmed the defendant's conviction in *Worthington, supra*, for failing to act when required to act by law. The legislature's directive in IC 35–41–2–1(a) is clear—the failure to act may form the basis of a criminal conviction.

The record on appeal contains ample evidence to establish as a matter of law that the Slushers owed Novick and her social guests the duty to maintain the stairway in a safe condition. The majority of this Court agrees that such a duty existed, but it nevertheless refuses to affirm the Slushers' convictions for reckless homicide. Rather, the majority deems the reckless homicide statute to be "vague." The majority's decision seriously misinterprets the legislative directive that permits criminal prosecution for an omission to act.

The jury's factual determination that the Slushers recklessly caused the death of Laureen Olsen should be affirmed.